WILLIAM F. BUTLER *et al.*, Plaintiffs and Counterdefendants-Appellees, *v.* METZ, TRAIN, OLSON & YOUNGREN, INC., Defendant-Counterplaintiff-Third-Party Plaintiff-Appellant.—(STATE BANK OF ST. CHARLES *et al.*, Third-Party Defendants-Appellees.)

Second District   No. 76-468

Opinion filed July 18, 1978.

Herbert J. Linn and James J. Clarke, II, both of Pederson & Houpt, of Chicago, for appellant.

Michael O'Brien, of Shearer, O'Brien, Blood, Agrella & Boose, of St. Charles, Robert F. Casey, of Geneva, and Dale C. Flanders, of Aurora, for appellees.

Mr. JUSTICE RECHENMACHER delivered the opinion of the court:

In April of 1973, a suit for declaratory judgment was filed by William F. Butler and William F. Butler Builder, Inc., against the architectural firm of Metz, Train, Olson & Youngren, Inc., the counterplaintiffs (hereinafter referred to as "Train" or "Train firm"), to determine the responsibility of Butler for architects' fees. Train filed an answer and counterclaim, claiming over $48,000 for unpaid fees and interest as well as an action to foreclose Butler's beneficial interest in Lot 3, pursuant to a security agreement executed by Butler on September 8, 1969.

The trial court found that the September 8 agreement was coerced and therefore void; that Train's claim for fees was not enforceable and that the assignment of Butler's beneficial interest in Lot 3 was likewise the result of coercion and not enforceable. The counterplaintiff, Train, appeals.

The complaint related that Train was continuing to claim fees in connection with two buildings for which he had furnished architectural services, when only one building had been built and, moreover, that Train had failed to account properly for payments already made by Butler and the complaint asked that the court (1) declare that Butler was only liable to pay fees attributable to the cost of constructing the one building that was actually completed and (2) that the court fix a balance as the actual amount due to Train, after giving credit for payments Butler had already made.

Attached to the complaint was a copy of the original agreement dated January 22, 1968. This was in the form of a contract between the parties whereby Train agreed to furnish architectural services, including preliminary drawings, "working" detailed drawings and on-site supervision for the construction of an apartment complex which the contract relates "will consist of two similar buildings, each containing approximately 100 apartment units and 100 enclosed parking places."

The scope of the architects' proposed services was described in three paragraphs, being I-A, I-B and I-C. I-A was investigation of site, including utilities, zoning and other restrictions and preliminary sketches needed for obtaining financing. I-B included preparation of all final working drawings, including structural, mechanical and electrical details, floor plans, elevations, cross-sections, etc. Under I-C the Train firm was to assist in the solicitation of competitive bids, the checking of contractors' shop drawings, the appraisal of material samples, and the issuance of certificates of payment and "full time inspection of construction."

Section II of the contract set forth the basis of compensation for the

Train firm's services. Since it is a focal point of the controversy, we reproduce this section in full:

"II. *COMPENSATION*

For our services outlined in Section I-A, we are to receive the cost of our technical personnel assigned to the project plus one hundred and fifty per cent (150%) to cover overhead and profit. If the project proceeds and our services as described in Section I are completed, we are to receive the cost of our technical personnel assigned to the project plus one hundred and fifty per cent (150%) for overhead and profit up to a maximum of 3.25% of construction costs.

Technical personnel shall include principals and officers, when involved in a technical capacity, and all other personnel assigned to the project, including specification typists, but exclusive of general office employees such as accountants, bookkeepers, secretaries, stenographers, plan clerks, switchboard operators and office boys."

The testimony at trial indicates that Butler had heretofore built only single family residences. He conceived the plan of building a "Y"-shaped apartment building in the St. Charles area, where he had been building houses and which would be bigger and more attractive than anything previously built in that area.

Arthur Train, executive vice-president of the architectural firm, testified that Butler at first proposed a simple two-story building of 200 apartments in a "Y"-shaped form but that Train pointed out that there were problems with such a large building, chiefly the length of the halls, if it was built as one building of two stories. He suggested that the project would be more attractive as living quarters if it were constructed as two separate buildings.

In the original agreement of January 22, 1968, there was no mention of the possibility of only one building being built, nor is there any suggestion that the construction of the second building would be dependent upon the achievement of a substantial percentage of tenancy in the first building. The question as to whether there was initially any consideration given to the possibility of stopping after only one building was completed, is regarded by Butler as critical to his case, since he contends he is only obligated under the contract of January 22, 1968, to pay a maximum fee of 3.25% of "construction costs," and construction costs mean brick and mortar in place for whatever is actually built. He contends that since only one building was actually built, he owes only 3.25% of the actual construction costs of that building and he has already paid that amount and more.

Train's testimony, on the other hand, was that when they began preliminary discussions with Butler in December of 1967, and prior to

January 22, 1968, he had indicated a maximum fee of 6.5% of construction costs, based on two buildings with different site locations. Train testified that Butler's response to this was that he thought a 6.5% architectural fee might not be attractive to lenders and that he (Butler) countered with the request that the fee be split and allocated one-half to each building, that is 3.25% for each building. That is, Train testified, that the fee remained 6.5% but was merely allocated one-half or 3.25% to each building. Train testified that this fee took into consideration that Butler had indicated that he wanted a more or less luxury-type of building, superior to the average apartment building built heretofore in the St. Charles area.

Butler in his testimony claimed that while the agreement of January 22, 1968, did not suggest that possibility, he had never intended to build the second building until he had reached substantial occupancy of the first building, and that he had so indicated to Train. Moreover, he contended that to him, as a builder, "construction costs" meant actual bricks and mortar in place, whereas Train testified it meant the construction costs estimated after the drawings had been made.

Some credence is lent to Butler's contention that it was understood that the construction of the second building would be contingent upon the acceptance of the first building by the public, through a memo prepared by Hogan who, at that time, was Train's project superintendent for this project. The memo is dated March 5, 1968, and contains the following, under paragraph 6:

> "The project will consist of the two "Y" shaped buildings, the clubhouse and pool and the site development. The construction of the second apartment building will depend on the demand for apartment rental in the first unit."

Hogan was no longer employed by the Train firm at the time of the trial and had, in fact, left its employ in May 1968, shortly after the memo in question was written.

Train testified that upon receiving a copy of Hogan's memo of March 1968, he called Butler and inquired about the suggestion that construction of the second building was contingent on the demand for the apartments in the first building, and that it possibly might never be built. He testified that Butler told him, in answer to the inquiry, that he was only referring to the *time* of building the second building and did not contemplate the possibility it might never be built.

He further testified that when the building got further along it became apparent that it was going to cost more than Butler had originally contemplated and Butler requested that certain changes be made in the plans, which request Train complied with. About July of 1968, Train, not having received any payment for the fees billed to that date, inquired of Butler as to when he was going to be paid. According to Train, Butler told

him his billings to date would be paid as soon as Butler received his first draw from his construction loan. In September, 1968, Train proposed that his firm be paid interest on the unpaid balance due on his invoice and a memorandum was prepared to that effect by Train and signed by Butler. Train testified that it was not until the summer of 1969, when he was approached by Butler to sign a certificate of payment for a draw against the construction loan that he became aware, from the number of the certificate, being No. 3, that Butler had previously received two payouts under the construction loan and, contrary to his agreement with Train, had made no payment to Train. Train refused to sign a waiver of lien to clear the third payment and discussions were then held as to how the fees due Train were to be taken care of in the future. Train testified that it was about that time—around July of 1969—that he first became aware that Butler might not build the second building because of higher construction costs than he had anticipated and, also, due to the disappointing response on the rental of the first building. Negotiations then began in an effort to work out some way of assuring the architects that their fees would be taken care of. At that time, one payment of $7,000 had been made on the fees, which, by that time, totaled some $87,000.

After Train refused to sign a waiver of lien for the third payment on the construction loan with Continental Bank, there were negotiations between the parties. Butler wrote a letter to Train offering to pay 6% of the construction costs of one building as Train's fee. Train by that time had done work on the plans for the second building, so this proposal was not accepted by Train and in the meantime, the Continental Bank refused to make any further payments on the construction loan. After a meeting in July and at least one further meeting in August, which did not resolve the situation, Train, on August 26, 1969, filed a mechanic's lien against the project showing a balance due for architects' fees of $80,334.36, of which Train calculated 80% was then due, or a current balance of $64,881.

Butler tried to persuade the Continental Bank to release the funds necessary to pay off Train's lien, but Continental refused to do so. Finally, on September 8, 1969, an agreement—technically described as an amendment to the original agreement of January 22, 1968—was worked out whereby Butler acknowledged that there were two buildings involved in the project and agreed to the balance of $80,334.36 for the architectural fees as being correct, based on 3.25% of estimated construction costs for each of two buildings, with the provision that the cost figure would be reduced proportionately if the costs for the second building were found to be less than the first building. The agreement provided for interest on the fees not timely paid and in the agreement Butler acknowledged that the services, for which the fees were acknowledged to be due, had been satisfactorily performed.

In addition, as part of the agreement of Sepember 8, 1969, and as further security for payment of the architects' fees, Butler executed an assignment in Train's favor of Butler's beneficial interest in Lot 3, which was part of the project in question. (To avoid unnecessary complications not relevant to the issue in this appeal, we disregard the claimed interest of the third-party defendant, State Bank of St. Charles, which subsequently intervened as trustee in connection with Lot 3.)

Upon the signing of the agreement of September 8, 1969, the mechanic's lien was released, the construction loan funds became available and one building of the project was completed. Train continued to provide architectural services until the said building was completed in June of 1970. The second building was never built and Train did not receive any further payments on his architects' fees. In December of 1970, Train submitted an account to Butler showing an adjusted balance of $43,122.21. This was not paid and, in September of 1972, Train submitted another account which, with claimed interest, amounted to $48,155. On April 5, 1973, Butler filed the declaratory judgment action which precipitated this appeal. On May 23, 1973, Train responded by filing an answer and counterclaim, claiming over $48,000 for unpaid fees and interest. Train also asked for foreclosure of Butler's beneficial interest in Lot 3 of the project, per the security agreement Butler had signed pursuant to the agreement of September 8, 1969.

Butler's answer to the counterclaim was filed July 25, 1973, and was a general denial—no affirmative defense was raised—Butler merely denied the amount claimed was correct. On the same date and after some further preliminary pleadings, Butler filed a "pleading" in the nature of a cross demand or counterclaim which, for the first time, raised the affirmative defense of duress—that is, that Butler was coerced by the exigencies of his financial predicament in August 1969 into executing an agreement and assignment of beneficial interest. Butler claims that there was no consideration for the obligation he undertook thereby because Train's claim for fees was false and Butler further claims he signed the agreement only because Train had placed him in a financial position whereby he had to sign or be ruined. It should be noted that while the original action in declaratory judgment was filed in April of 1973, and Butler's answer to Train's counterclaim was filed in July of 1973, the defense of "coercion, duress and external pressure" was raised for the first time in May 1975, in answer to the counterclaim. In this answer to Train's counterclaim, Butler asserted (1) that there was no consideration for the promise to pay the fees mentioned in the agreement of September 8, 1969, because no such fee had been agreed on in the original agreement—that the agreed fee was only 3.25% not 6.5%, therefore there was no consideration for the agreement or for the assignment of beneficial interest and (2) that

the filing of a mechanic's lien on the basis of the claimed fees, at a time when the building was 50% completed, was done as a coercive measure to force acceptance of the claim being made by Train and the agreement, being the result of such coercion, was not a product of Butler's free will and, therefore, was not an enforceable contract.

After a lengthy trial, producing some 1130 pages of testimony and argument, the trial court held that coercion had been used by Train to force Butler to accept the agreement of September 8, 1969, therefore, the claim was not enforceable as a valid contract for the claimed fees and the assignment of beneficial interest in Lot 3 was likewise the result of coercion and unenforceable.

In this appeal, Train contends the court erred in holding the settlement agreement of September 8, 1969, was void on the ground of duress because (1) it was a negotiated settlement, preceded by several weeks of negotiations between the parties and signed by Butler on the advise of his counsel, (2) it is not in any case duress for a creditor to use a legal remedy to enforce what he believes to be a valid claim, (3) Butler ratified the agreement by continuing his relationship with Train and accepting the benefits of the agreement until the completion of the building—some 10 months later, without raising this contention, (4) Butler was not so vulnerable as he now claims—at the time in question he had other alternatives such as the ability to make additional loans, etc., which he did not avail himself of, therefore, he was not legally coerced, and (5) the length of time which elapsed between the execution of the September 8, 1969, agreement and the raising of the issue of coercion in May 1975 is far too long to make this a credible defense.

■■ The defense of duress by the application of financial pressure—known in modern terms as "business compulsion" is a valid defense under certain circumstances. It is commented on in 25 Am. Jur. 2d *Duress and Undue Influence* §7 (1966), in the following terms:

> "The doctrine of 'business compulsion' cannot be predicated upon a demand which is lawful, or upon doing or threatening to do that which a party has a legal right to do, such as filing a justifiable statutory lien. The actual existence of duress must be demonstrated as well as the likelihood that serious harm would occur to business if the demanded action were not taken. * * *."

On the question of duress generally the language of *Kaplan v. Kaplan* (1962), 25 Ill. 2d 181, 187, is instructive:

> "The first allegation of the complaint is that Elaine Kaplan threatened to publicize the photographs by suing the woman in whose apartment they had been taken for alienation of affections. This allegation clearly presents no basis for a claim of duress

inasmuch as it is well established that it is not duress to institute or threaten to institute civil suits, or for a person to declare that he intends to use the courts to insist upon what he believes to be his legal rights, at least where the threatened action is made in the honest belief that a good cause of action exists, and does not involve some actual or threatened abuse of process."

The cases cited by Butler in support of his plea of duress are very obvious cases of either legal or moral wrongdoing. The case of *Chicago & Alton R.R. Co. v. Chicago, Vermilion & Wilmington Coal Co.* (1875), 79 Ill. 121, was a case where a railroad was built by a coal company and it was agreed by the railroad company and the coal company that the coal would be carried at $3 per ton. The railroad was later sold to another railroad which continued the $3 per ton rate for about 3 years, but then suddenly increased the charge to $9 per ton. Since the road had originally been built by the coal company and it was its only means of getting its coal to market, the court felt that the new railroad was legally bound to continue the $3 per ton rate, because the railroad had been built by the coal company and this agreed $3 rate per ton made it economically possible to build it in the first place. Moreover, the assuming railroad had ratified the arrangement by continuing it over a three-year period of time, before suddenly tripling its charge. We see no parallel between this case and the one we consider here. *Rees v. Schmits* (1911), 164 Ill. App. 250, was an obvious use of moral and legal chicanery which come close to being blackmail, where the plaintiff paid certain interested property owners a sum of money in order to induce them to drop an unfounded suit, which they did drop thereafter, upon payment being made. It does not in anyway resemble the present case. *Pittsburgh Steel Co. v. Hollingshead & Blei* (1916), 202 Ill. App. 177, is a rather dubious decision in which Pittsburgh Steel attempted to recoup some $850 which it had lost by virtue of two uncollectible drafts which had been endorsed by Blei and sent on to Pittsburgh, but which Pittsburgh had neglected to present before the makers went bankrupt. In that case, it was a question of which of two parties, both innocent, should suffer the loss. Pittsburgh was legally responsible for the delay, but felt that Blei should accept the loss and refused to ship any more of the steel it had contracted to supply to Blei until the $850 was made good by Blei. Blei paid the $850 and the shipments were resumed, as per the contract. Afterward, Blei, not having paid certain invoices of Pittsburgh, Pittsburgh sued for the amount of such invoices and Blei asserted a setoff of $850 against such invoices, claiming he had been coerced into paying the $850 which legally he did not owe, in order to induce Pittsburgh to resume shipment of the orders. He had already resold these orders and was in financial peril if the orders were not filled. Pittsburgh contended the $850 payment was a compromise,

fairly entered into by both parties, for their mutual advantage but a majority of the appellate court sustained the trial court's finding that the circumstances amounted to duress. One judge dissented on the ground that the payment had been made "between two business corporations as the result of protracted conferences and negotations" (202 Ill. App. 177, 183) and should not have been held to be made under duress. While we regard the *Pittsburgh* case as being far from a clear-cut case of duress, we note a crucial difference between it and the case at hand, in that Pittsburgh was refusing to carry out a contract obligation, which it had assumed, and in reliance of which Blei had made financial commitments. In our case, the filing of the mechanic's lien was done to protect a debt for services already performed and while it was asserted by Butler that the amount claimed was excessive, there was no question but that Train had a claim of some amount against Butler for services performed, which was past due and owing and which was properly subject to a mechanic's lien. Train's action in filing the lien may, therefore, be construed as a defensive act rather than as being threatening or coercive in character. We think the filing of the mechanic's lien, in and of itself, did not constitute duress.

Butler contends, however, that the subsequent agreement of September 8, 1969, was coercive in character because it induced him, in return for the lifting of the ruinous mechanic's lien, to (1) acknowledge twice the obligation for architects' fees he had actually agreed to and (2) precluded him from objecting to certain failures and deficiencies in the Train firm's performance of its obligation and (3) forced Butler to make an assignment of his beneficial interest in Lot 3 of the property in question. Therefore, Butler argues the exchange of the lifting of the lien for his signature on the agreement of September 8, 1969, was a coercive transaction.

Viewed from Butler's standpoint in 1975, when he first raised the issue of coercion—the argument as to duress may have an appearance of logic, but looked at from the standpoint of Train in 1969—when the alleged coercion occurred—the argument is much less persuasive.

■■ It is not contended that Train did not have a legal right to file a mechanic's lien. The filing of a mechanic's lien claim is not only proper and legal but is often the only practical and expedient way a contractor or architect can enforce his claim. While Butler was put under pressure by the filing of the lien, it must be recognized that Train was under pressure also. The firm had expended a great many hours of valuable time and effort without receiving more than a token payment and by the summer of 1969, it had become apparent to Train that Butler was in trouble—in fact, Butler so admitted, saying that the subcontractors' bids were coming in at a figure much higher than he had anticipated and at the same time his advance rentals were disappointing. He advised Train he could not,

therefore, pay him anything even though by that time he had received two payouts on the construction loan. Train, after learning that two payouts had been made, without his authorization, and without any payment to Train, asked Continental Illinois Bank not to make any further payouts on the construction loan without Train's approval. This was a reasonable request—Train had a right to be included in any payouts made under the construction loan. Train then had to make a decision as to what he would do to insure his fees being paid. Since mechanics' lien claims are purely statutory and if not timely filed may be prejudiced by other claims which are so filed, a delay may prove costly. Train, therefore, could not wait in the hope that Butler's financial condition would improve, without jeopardizing his own priority. The mere fact that the lien was filed at the time when Butler was financially vulnerable carries no implication of duress—it is at such a time that mechanics' liens are most apt to be filed— purely from a defensive standpoint.

■■ Butler, however, contends that while Train had a legal right to file a mechanic's lien, the lien itself was for an exaggerated and unwarranted amount and the lien was filed to induce acceptance of an agreement to pay such unjust and indefensible fees. Thus, inquiry must be made whether the mechanic's lien was based on a claim made in good faith and honestly believed to be due in the amount claimed. It is noted that from the testimony at trial that Train originally wanted 6.5% as a maximum fee based on "construction costs." From the evidence adduced at trial this does not appear to be an exaggerated or unconscionable percentage for a well-known loop architectural firm. Certainly a fee of 3.25% of construction costs seems less than average for a prestigious firm, judging from expert testimony. Train offered a reasonable explanation of the misunderstanding—if such it was—in his testimony in which he said it was a division into two parts of the anticipated overall fee of 6.5% and was suggested by Butler to make the loan more attractive to prospective lenders. But, at that time, it was contemplated that both buildings would be built, and it was simply a division of the expected fee of 6.5% into two parts. We cannot say that this explanation was so dubious or the percentage of fee claimed so excessive, in and of itself, to suggest fraud and coercion. Even if the difference between Butler's and Train's concept of the fee was based on an honest misunderstanding, the defense of coercion cannot be based on such a mere difference of opinion. Since Train was exercising its legal right in filing the mechanic's lien, this act in and of itself was not coercive. The agreement of September 8 followed several negotiating meetings and it appears from the exhibits and testimony at trial that there were meetings and negotiations to resolve the question of Train's fees over a period of from mid-June until a few days before the September 8 agreement was signed. Butler was represented by

counsel during these meetings and apparently some concessions from Train's original proposals were encompassed in the September 8 agreement—that is, the acceptance of assignment of a beneficial interest in Lot 3, owned by Butler, in lieu of an outright mortgage and a modification of fees if the cost of the second building turned out to be less than the cost of the first building.

The meaning of the phrase "construction costs" likewise, although perhaps ambiguous, is also susceptible to an honest difference of opinion and a claim by an architect is not potentially unjust merely because it is based on estimated construction costs, rather than on bricks and mortar actually in place. The burden is on the person making the invidious charge of duress to prove it and we do not believe that burden has been sustained in this case. Coercion and duress are characteristically accompanied or preceded by threats or unpleasant hints or suggestions. There is no evidence of any such thing in the record before us. Train simply filed a mechanic's lien after negotiations had failed to resolve the impasse and payment had not been made. Undoubtedly, the pressure of circumstances placed Butler at a disadvantage during the negotiations which followed, but this is a far cry from establishing actual active coercion by Train.

Train also contends that Butler had other alternatives, which he did not use, and that he simply chose to execute the agreement of September 8 as the better alternative. The evidence is not conclusive on that point as to what other sources for funds Butler had available. Train suggests Butler could have borrowed from an associate, could have asked the title company to insure over the existing lien or could have used the expedited procedure available through the mechanics lien statute to bring about a prompt determination of the merits of Train's claim if, indeed, he considered it to be specious or exaggerated. (Ill. Rev. Stat. 1975, ch. 82, par. 34.) Butler did not avail himself of any of these alternatives, and while we express no opinion as to whether they were desirable or practical solutions to his difficulties, Butler's suggestion of absolute constraint imposed on him by Train is somewhat lessened by these possible alteratives. In *Hyde v. Lewis* (1975), 25 Ill. App. 3d 495, where a claim of duress was made, the court said:

> "Duress has been defined as a condition where one is induced by a wrongful act or threat of another to make a contract under circumstances which deprive him of the exercise of his free will. (*Kaplan v. Kaplan* (1962), 25 Ill. 2d 181, 182 N.E.2d 706.) But the use or threatened use of civil proceedings to enforce a claim is not considered duress, '* * * at least where the threatened action is made in the honest belief that a good cause of action exists, and

does not involve some actual or threatened abuse of process.' " 25 Ill. App. 3d 495, 501.

In any event, however, there is another aspect of the defense of duress to be considered under the facts of this case. Where the issue of duress or business compulsion is raised it is pertinent to inquire whether the person charging duress has, by affirmative conduct or substantial delay following the transaction complained of, waived that defense.

■■ Train contends the issue of duress cannot be raised by Butler because he waived it by his subsequent conduct and the long delay in asserting such defense. Train points out that after the September 8, 1969, agreement was signed Butler continued to employ Train and Train acted as architect for the project, until its completion in June of 1970, rendering further services during that time, for which he continued to bill Butler a considerable sum. During this period there is no suggestion in the record that Butler in any way repudiated the agreement of September 8, or the continued services of Train as architect. After the building was completed Train continued to bill Butler for the balance of services not paid for by the September 8, 1969, payment and services rendered subsequently, up to the building's completion. These bills were not paid but at no time during the period between September 8, 1969, and April 1973 did Butler raise the issue of duress. Even when he filed his declaratory judgment suit in April 1973 he did not raise this issue but merely contended he had paid what was owed and more and asked the court to so find. It was not until May 1975 in his answer to Train's counterclaim, that Butler raised the question of duress. The building had been completed and he had had whatever benefit he derived from Train's professional services for several years, by that time. We think the plea comes too late. A contract entered into under duress is not void, but merely voidable. (See 25 Am. Jur. 2d *Duress and Undue Influence* §28 (1966); *Bogue v. Franks* (1902), 199 Ill. 411; *Eberstein v. Willets* (1890), 134 Ill. 101.) In this case, we think the long delay in raising the issue of duress and the fact that it was raised for the first time as a defense to a counterclaim (and almost 6 years after the transaction in question) mitigates severely against recognizing it as a valid ground for avoiding the contract. See *Eberstein v. Willets* (1890), 134 Ill. 101: *Kirkeby v. Avenue Hotel Corp.* (1947), 330 Ill. App. 246 (abstract); Annot., 77 A.L.R. 2d 417 (1961).

The judgment of the circuit court of Kane County is therefore reversed and the cause is remanded to the trial court for further proceedings not inconsistent with this opinion.

Judgment reversed and cause remanded.

GUILD and WOODWARD, JJ., concur.