BRUCE GOLDEN, Plaintiff-Appellant, v. McDERMOTT, WILL AND EMERY
*et al.*, Defendants-Appellees.

First District (2nd Division)    No. 1—97—3799

Opinion filed September 30, 1998.—Rehearing denied November 4,
1998.—Modified opinion filed November 10, 1998.

Bruce P. Golden, of Bruce P. Golden & Associates, and Edward A. Berman, of Edward A. Berman, P.C., both of Chicago, for appellant.

Stephen Novack and Bruce Braverman, both of Novack & Macey, of Chicago, for appellees.

JUSTICE COUSINS delivered the opinion of the court:

Bruce Golden, the appellant, filed suit against the appellees, law firm McDermott, Will & Emery, as well as certain partners in their individual capacities. Golden alleged that the appellees breached the partnership agreement by expelling him in contravention of specified procedures, breached their fiduciary duty as co-partners and committed fraud in misrepresenting and withholding information from him

while his severance agreement was being negotiated, and breached the severance agreement by not paying him the full amount due under it.

Upon a section 2—619 (735 5/2—619 (West 1994)) motion by appellees, the judge dismissed the complaint on the basis of various defenses, including the statute of limitations and a release signed by Golden as part of the severance agreement. Golden appeals, claiming that the trial court erred in granting the motion to dismiss his complaint. The plaintiff's complaint alleged, *inter alia*, (1) breach of contract, (2) breach of fiduciary duty, and (3) duress. The plaintiff also contends that the trial court erred in not allowing him leave to amend his complaint a third time.

We affirm.

## BACKGROUND

The appellant, Bruce Golden, is a securities lawyer who worked for the appellee law firm McDermott, Will & Emery (MWE) for 21 years. He joined the firm in 1970, was made an income partner in 1976 and was made a capital partner in 1981. Among the clients he brought to MWE were a public real estate syndicator known as Avanti Associates (Avanti), and its promoter, Timothy Sasak.

In 1989, a class action suit (the Avanti suit) was brought against Sasak and Avanti for, among other things, violation of securities laws in the sale of its partnership assets. MWE was also named as a defendant. The plaintiffs sought to recover $120 million from MWE.

Golden alleges that shortly prior to the Avanti suit, MWE obtained a malpractice insurance policy with Attorney's Liability Assurance Society, Ltd. (ALAS). The claims from the Avanti suit were the first that ALAS had to pay out for MWE, and ALAS said that those claims were the largest it had ever been required to cover for any firm.

Golden also alleges that ALAS was hesitant to renew MWE's insurance policy as a result of the Avanti suit and that MWE had talks with ALAS in order to save its coverage. ALAS, he alleges, wanted him removed from the firm, and MWE acceded. MWE postponed his termination, Golden claims, because it needed his cooperation in the Avanti litigation.

Golden further alleges that from the time of the Avanti suit MWE began to limit his participation in partnership business and reduced his partnership interest. In particular, he alleges the following: (1) around the beginning of 1990, he was told that John McDermott, a partner of MWE and a named defendant in this suit, had directed that he not be given any more work for United Airlines, a major MWE client for which Golden had been doing much work; (2) from that time

he was not given any "meaningful assignments" with United or any other MWE client; (3) John McDermott told him that he should not bring in any new business and McDermott also took over his contact list, purportedly in order to ease his workload; and (4) late in 1990, partner Robert McDermott suggested that he look into nonlegal careers.

In January 1991, the firm reduced Golden's partnership units by a third. Golden's compensation was based upon these units, as was the amount he would receive in a severance package.

The Avanti litigation settled on July 18, 1991. The next day, partners Stanley Meadows and James Roche, also defendants in this action, informed Golden that he was being fired but that the firm would give him the opportunity to resign first. At that meeting Golden was told that the reason for his firing was "lack of production," although he says that Meadows later informed him in confidence that pressure from ALAS was the real reason.

Over the next few months Golden and the firm worked out a severance agreement to settle his accounts. The severance agreement contained the following release clause:

> "Golden *** releases *** the Firm *** from any and all claims *** whether now known or unknown *** including, but not limited to, any and all claims *** relating to or arising out of Golden's partnership, tenure or separation from the firm *** provided, however, that this release and discharge shall not bar Golden from bringing any action to *** enforce this agreement."

In consideration for the release, MWE gave Golden a one-time payment of $225,000 minus the amount of his draw subsequent to October 31, 1991. Golden claims that MWE deducted more than this amount from the $225,000, although he did not specify the amount of the excess deduction. At Golden's behest, a provision was also included in the agreement that would allow him to sue ALAS for getting him fired.

Golden claims that in the negotiations MWE falsely told him that his severance payment was the largest given to any terminated partner and was the same amount that he would have gotten had he resigned voluntarily. He also claims that MWE concealed the fact that no vote had been taken on his expulsion, as was mandated by the partnership agreement.

Around the time that Golden signed the severance agreement, he was having personal problems. He had just lost a lawsuit concerning a major defect in a house he had bought. His wife's employer had died, and, as a result, she also was out of work. Golden sought counseling.

He says that the mental health professional reported that the termination had left Golden "paranoid," "fragmented," having "major depression, recurrent" and as "dysfunctional" with "chaos reigning supreme."

On November 7, 1991, Meadows told Golden that the management committee had not taken a vote on his expulsion. He told Golden that he would have difficulty finding new legal employment, because ALAS had "blacklisted" him. Golden says that Meadows also told him at some time during negotiations that "he was personally embarrassed by [the proposed settlement agreement's] burdensome language, and that no other partner had ever been asked to sign such a harsh document."

Golden took out a lease on an office at what he claims to be a grossly inflated rent. He says that he took an "of counsel" position with another law firm but received no compensation for it.

In January of 1992, MWE tendered, and Golden accepted, payment of money due under the severance agreement.

In December 1995, Golden filed suit against ALAS. He alleges that he learned facts in discovery that led him, on December 30, 1996, to file the instant action against MWE and some of its partners. In February of 1997, MWE partner James Roche was deposed in the ALAS case. Golden alleges that many facts important to his case came to light only as of the time of this deposition.

Golden's complaint alleged, *inter alia*, that MWE breached the severance agreement by not paying him the full amount due under it; that MWE violated the partnership agreement by not following the termination procedure outlined therein; and that the defendant partners violated their fiduciary duty to him as co-partners and committed fraud on him. He asked for damages, as well as a dissolution and accounting of the firm.

Golden argued that the release that he signed was voidable because it was signed under moral and economic duress, and because the defendants withheld and misrepresented facts to him in negotiations, in violation of their fiduciary duty.

The trial court allowed two amendments to the complaint, but, upon a section 2—619 motion by the defendants, dismissed it rather than allow a third. This dismissal was based on several affirmative defenses pled by MWE. First, MWE argued that the contract claims were barred by the release and any other claims were barred by *laches* or the statute of limitations. They argued that the trial court should dismiss the claim for breach of the severance agreement because of

*laches*, ratification and the fact that it was not pled with sufficient particularity despite Golden's three opportunities to do so.

The trial court agreed with the defendants and dismissed the complaint. It held that the claim for the breach of the severance agreement was not adequately pled, that the claim for breach of the partnership agreement was barred by the release, and that the other claims were barred by the statute of limitations.

ANALYSIS

■ This case comes to us on appeal from a section 2—619 dismissal, and, accordingly, we must accept well-pled allegations in Golden's complaint as true. 735 ILCS 5/2—619 (West 1994); *Elliot v. LRSL Enterprises, Inc.*, 226 Ill. App. 3d 724, 589 N.E.2d 1074 (1992). But while a court generally must accept all well-pled facts as true in this situation, it does not have to accept conclusions of law or conclusions of fact not supported by factual allegations. *Nikolic v. Seidenberg*, 242 Ill. App. 3d 96, 610 N.E.2d 177 (1993).

■ Golden contends that the release cannot bar his claims because MWE obtained the release by withholding and misrepresenting facts in violation of its fiduciary duty. If MWE had withheld material facts, it would have made the release voidable. Parties in a fiduciary relationship owe one another a duty of full disclosure of material facts when making a settlement and obtaining a release. *Janci v. Cerny*, 287 Ill. 359, 365-66, 122 N.E. 507, 509 (1919).

■ MWE contends that it did not breach a fiduciary duty to Golden in negotiations, because the partnership with Golden had dissolved at that point and a fiduciary duty among partners ends upon dissolution. The Uniform Partnership Act defines "dissolution" as "the change in the relation of the partners caused by any partner ceasing to be associated in the carrying on, as distinguished from the winding up of the business." 805 ILCS 205/29 (West 1994). Dissolution can be effected by the express will of any party, even if in contravention of the partnership agreement. *Bluestein v. Davis*, 86 Ill. App. 2d 61, 67, 280 N.E.2d 61, 64 (1967).

■ MWE contends that dissolution occurred on July 19, 1991. Relative to MWE's contention, the record establishes that the defendants had already forbidden Golden from taking on any more new business. So, the work he was doing was being limited before July 19, 1991. Then, on July 19, the defendants communicated to Golden that he was being fired but would be allowed to resign. Therefore, MWE contends that dissolution was complete on July 19. We agree. However, even were dissolution not complete on July 19, it is clear that dissolu-

tion occurred by October 19, 1991, when Golden signed the agreement.

There is a conflict of authority in Illinois as to whether a fiduciary relationship among partners ceases upon dissolution of the partnership. MWE relies on *Babray v. Carlino*, 2 Ill. App. 3d 241, 276 N.E.2d 435 (1971), for the proposition that the obligations end upon dissolution.

In *Babray*, the plaintiff and the defendant were partners operating a motel. The defendant bought out the plaintiff's interest and obtained a release from any claims relating to the partnership. Over four years later the plaintiff sued for an accounting. She sought to avoid the release on the basis that the defendant had violated his fiduciary duty to her by withholding facts during negotiations. The court held that there was no breach of fiduciary duty since fiduciary duty ended upon dissolution. It went on to add that, even if there had been a fiduciary duty, the release would still stand, since the information withheld was "hardly a matter of crucial materiality," and the transaction was fair. *Babray*, 2 Ill. App. 3d at 252.

Among the cases Golden relies upon is *Burtell v. First Charter Service Corp.*, 76 Ill. 2d 427, 394 N.E.2d 380 (1979). In *Burtell*, the plaintiff and defendant were joint venturers holding real estate for development. With the consent of the plaintiff, the defendant sold the property, and the parties reached a private accounting. The defendant did not disclose, however, that it had given a purchase money mortgage on the property. The plaintiff later discovered this and sued for an accounting of payments under the mortgage. The defendant argued that the agreement to dispose of the partnership assets dissolved the partnership and that it no longer had a duty to disclose or account for profits after the sale was agreed upon. The supreme court rejected this argument, holding that a joint venturer could be entitled to an accounting of profits made after dissolution.

> "A fiduciary relationship exists between members of a joint venture. Thus, in this case a fiduciary relationship existed between plaintiff and First Charter. (*Reese v. Melahn* (1973), 53 Ill. 2d 508, 513). When a joint venture is found to exist, the legal principles pertaining to the relationship between partners govern. Section 21(1) of the Uniform Partnership Act (Ill. Rev. Stat. 1975, ch. 106½, par. 21(1)) provides:
>
> > 'Every partner must account to the partnership for any benefit, and hold as a trustee for it any profits derived by him without the consent of the other partners from any transac-

tion connected with the formation, conduct, or liquidation of the partnership or from any use by him of its property.'

Although the sale of the real estate by First Charter may have disposed of the assets of the joint venture, it would not extinguish the rights and obligations between the partners that arose from that relationship or that arose from the unauthorized dealing with its property. On dissolution, a partnership is not terminated, but continues until the winding up of its affairs is completed." 76 Ill. 2d at 437-38.

Furthermore, the provision of the Uniform Partnership Act (Act) cited above (805 ILCS 205/21(1) (West 1994)) implies that some fiduciary obligations continue after dissolution. Partners hold as trustees for the others benefits acquired from the liquidation of the partnership, which would be after the dissolution of the partnership.

■ In our view, the better rule is that partners stand in a fiduciary relationship to one another after dissolution, but only as regards winding up and accounting. *Bane v. Furgeson*, 707 F. Supp. 988 (N.D. Ill. 1989). They do not have to account for new business that they start. *Bluestein v. Davis*, 86 Ill. App. 2d 61, 280 N.E.2d 61 (1967). Under the Act, partners still have authority to bind the partnership after dissolution, but only as regards winding up and liquidation. 805 ILCS 205/33, 35 (West 1994). Since the partners are still agents after dissolution with regard to these matters, it follows that they are also fiduciaries, because "[a]n agent is a fiduciary with respect to matters within the scope of his agency." Restatement (Second) of Agency § 13 (1958); *In re Rosenbaum Grain Corp.*, 103 F.2d 656, 661 (7th Cir. 1939).

■ We find that MWE stood in a fiduciary relationship to Golden at the time of the severance agreement, at least for the purposes of their private accounting. See *Kurti v. Fox Valley Radiologists, Ltd.*, 124 Ill. App. 3d 933, 938-39, 464 N.E.2d 1219 (1984) ("The existence of a confidential relationship is not precluded by the fact that plaintiff had been notified of his impending termination ***. Indeed, the need to prevent a fiduciary from taking improper advantage of the dislocation attendant upon the ending of a confidential relationship requires that fiduciary principles be observed so long as the relationship continues"). Thus, the fiduciary relationship continued until the winding up was completed with the private accounting entered into on October 19, 1991.

Nevertheless, the agreement would only be voidable if MWE had withheld facts that were material to the transaction. *Janci*, 287 Ill. at 365-66; See also 29 Ill. L & Prac. *Partnership* § 268 (1957). A fact is material if the plaintiff would have acted differently had he been

aware of it. *Kleinwort Benson North America, Inc. v. Quantum Financial Services, Inc.*, 285 Ill. App. 3d 201, 673 N.E.2d 369 (1996). In our view, the alleged misrepresentations on MWE's part were not material to the agreement.

On the issue of duress, we agree with the trial court that Golden's allegations were insufficient to make out a claim. Golden alleges three closely related types of duress. First he claims that MWE coerced him by threatening to fire him. Then he says that it practiced economic duress (also known as "business compulsion") by taking unfair advantage of his financial and personal difficulties. Finally he alleges moral duress.

■ Although there are several proposed definitions of duress, the supreme court has defined it as "a condition where one is induced by a wrongful act or threat of another to make a contract under circumstances which deprive him of the exercise of his free will." *Kaplan v. Kaplan*, 25 Ill. 2d 181, 185, 182 N.E.2d 706 (1962). MWE contends that the pressure it applied to Golden did not constitute duress, because it was not wrongful.

MWE argues that it had a right to expel Golden without cause and that it cannot be duress for it to threaten to do what it has a legal right to do. Illinois cases support MWE's position, *e.g., Butler v. Metz, Train, Olson & Youngren, Inc.*, 62 Ill. App. 3d 424, 379 N.E.2d 1255 (1978). But while it is true that one must threaten "wrongful" action in order to be guilty of duress, the landmark supreme court case on duress, *Kaplan v. Kaplan*, 25 Ill. 2d 181, 186, 182 N.E.2d 706 (1962), says that the meaning of "wrongful" is "not limited to acts that are criminal, tortious or in violation of a contractual duty, but extends to acts that are wrongful in a moral sense." *Kaplan*, 25 Ill. 2d at 186. So even though an employee may be terminable at will, it is not impossible for the threat of discharge to constitute duress. *Laemmer v. J. Walter Thompson Co.*, 435 F.2d 680, 682 (7th Cir. 1970); *Mitchell v. C.C. Sanitation Co.*, 430 S.W.2d 933 (Tex. Civ. App. 1968); see also Annotation, *What Constitutes Duress by Employer or Former Employer Vitiating Employee's Release of Employer from Claims Arising out of Employment*, 30 A.L.R.4th 294 (1984).

■ On the other hand, it is not wrongful and does not constitute duress for an employer to give an employee who is about to be fired the option to resign. *Enslen v. Village of Lombard*, 128 Ill. App. 3d 531, 533, 470 N.E.2d 1188 (1984). "It would be a dangerous doctrine to hold that to offer an employee a choice of resigning or accepting a discharge would amount to such compulsion that the employee could

avoid his resignation for duress." *Fox v. Piercy*, 119 Utah 369, 376, 227 P.2d 763, 767 (1951).

■ Golden cites *Oglesby v. Coca-Cola Bottling Co.*, 620 F. Supp. 1336 (N.D. Ill. 1985), a case under the Age Discrimination in Employment Act of 1967 (29 U.S.C. §§ 629 through 634 (1994)) that seems contrary to this principle. See also *Massi v. Blue Cross & Blue Shield Mutual*, 765 F. Supp. 904 (N.D. Ohio 1991). In our view, *Oglesby* is distinguishable. *Oglesby* held that a "resign or be fired" choice could be duress. *Oglesby*, 620 F.2d at 1342. In that case, however, a condition of resignation was the signing of a release that the employee was not given an adequate opportunity to read, much less negotiate. The plaintiff did not have a chance to get legal advice concerning his dilemma. He was forced to choose on the spot between termination or resignation coupled with a mysterious agreement. *Oglesby*, 620 F.2d at 1342. So, even if the choice of "resign or be fired" can constitute duress, the choice was not sufficient to constitute duress under the facts as alleged here.

■ Golden next alleges economic duress or business compulsion. Economic duress occurs where "undue or unjust advantage has been taken of a person's economic necessity or distress to coerce him into making the agreement." 12 Ill. L. & Prac. *Contracts* § 142 (1983). These dire circumstances must be such as to overbear the will of the plaintiff. *Higgins v. Brunswick Corp.*, 76 Ill. App. 3d 273, 277, 395 N.E.2d 81 (1979). Whether the circumstances did in fact overbear the plaintiff's will is ordinarily a question of fact. *Slade v. Slade*, 310 Ill. App. 77, 82, 33 N.E.2d 951 (1941).

However, it is not enough for economic duress that the plaintiff be in great financial or personal difficulty. The defendant must have been in some way responsible for that difficulty. " '[A] duress claim of this nature must be based on the acts or conduct of the other party and not merely on the necessities of the purported victim.' " *Alexander v. Standard Oil Co.*, 97 Ill. App. 3d 809, 815, 423 N.E.2d 578, 583 (1981), quoting *Chouinard v. Chouinard*, 568 F.2d 430, 434 (5th Cir. 1978); see also *Higgins*, 76 Ill. App. 3d at 278.

■ Assuming, under the facts as alleged, that MWE and the defendant partners were partially responsible for some of Golden's troubles, they still were not responsible for the death of his wife's employer, the loss of her job, or the loss of the lawsuit concerning Golden's house. In our view, the claim of duress lacked this necessary element of responsibility on the part of defendants for the plaintiff's circumstances. See *Alexander*, 97 Ill. App. 3d at 815.

■ Finally, Golden alleges moral duress. Moral duress is quite

similar to economic duress. It "consists in imposition, oppression, undue influence, or the taking of undue advantage of the business or financial stress or extreme necessities or weaknesses of another." *People ex rel. Buell v. Bell*, 20 Ill. App. 2d 82, 95, 155 N.E.2d 104 (1959). "[R]elief is granted in such cases on the basis that the party benefiting thereby has received money, property, or other advantage which in equity and good conscience he should not be permitted to retain." *People ex rel. Buell*, 20 Ill. App. 2d at 95.

As the trial judge observed, there are only a few Illinois cases on moral duress. Reported Illinois opinions have only found moral duress in extreme circumstances, such as those in *People ex rel. Buell v. Bell*, 20 Ill. App. 2d 82, 95, 155 N.E.2d 104 (1959). See also *In re Petition of Heubert*, 132 Ill. App. 2d 793, 270 N.E.2d 464 (1971); *Pittman v. Lageschulte*, 45 Ill. App. 2d 207, 195 N.E.2d 394 (1964). In *People ex rel. Buell*, an unwed mother was pressured into giving up her child for adoption. She was wrongfully told that if she did not give up the child she would not be able to keep her other children. She was weak and in poor condition when she signed the agreement, which she did not read and was not read to her.

In our view, these cases are inapposite. Golden was a legally sophisticated attorney who negotiated the severance agreement over the course of several months. Given the dissimilarity of these facts to the above cases, we hold that Golden has not established a claim for moral duress.

Even if the severance agreement were voidable because of duress or a breach of fiduciary duty, we believe that Golden ratified the agreement by his subsequent conduct. "It is well established that the retention of the consideration by one sui juris, with knowledge of the facts will amount to a ratification of a release executed by him in settlement of a claim, where the retention is for an unreasonable time under the circumstances of the case." 66 Am. Jur. 2d *Release* § 27 (1973).

A victim of fraud who, knowing of the fraud, "accepts the benefits flowing from a contract for any considerable length of time ratifies the contract." *Carlile v. Snap-on Tools*, 271 Ill. App. 3d 833, 842, 648 N.E.2d 317, 324 (1995); see also *Butler v. Metz, Train, Olson & Youngren, Inc.*, 62 Ill. App. 3d 424, 379 N.E.2d 1255 (1978). Golden accepted a large sum of money as a result of the settlement agreement, despite the fact that he was on notice at that point of facts that he says made the agreement voidable. He retained the money for over five years. This constitutes ratification of the release. See *Seward v. B.O.C. Division of General Motors Corp.*, 805 F. Supp. 623, 633 (N.D. Ill. 1992).

Accordingly, given the release's broad terms, it bars Golden's noncontract actions.

■ Golden further claims that MWE violated the severance agreement by not paying him the full amount due under it. Golden did not specify which deductions from the $225,000 he believes to be improper. In our view, this claim was not adequately pled to put MWE on notice of the nature of the claim against it and, thus, did not state a cause of action. *In re Beatty*, 118 Ill. 2d 489, 517 N.E.2d 1065 (1987). Although Golden requested leave to amend his complaint in order to rectify the deficiencies, whether to allow a plaintiff leave to amend a complaint is within the discretion of the trial court. *Johnson v. Abbott Laboratories, Inc.*, 238 Ill. App. 3d 898, 904, 605 N.E.2d 1098 (1992). Given the fact that Golden had had three previous opportunities to plead the claim correctly, we cannot say that the trial court abused its discretion in denying leave to amend yet again.

■ Although we have held that Golden's claims are barred because he has ratified the release, we will address the statute of limitations and *laches* issues for completion. Since Golden asks for relief in equity, the appropriate defense, strictly speaking, is *laches* rather than the statute of limitations. *First National Bank v. Road District No. 8*, 328 Ill. App. 122, 65 N.E.2d 396 (1946) (abstract of op.). *Laches* is defined as "such neglect or omission to assert a right, taken in conjunction with a lapse of time of more or less duration and other circumstances causing prejudice to an adverse party, as will operate to bar relief in equity." *Pyle v. Ferrell*, 12 Ill. 2d 547, 552, 147 N.E.2d 341 (1958).

■ Nevertheless, when a cause of action could be brought either in law or in equity, courts of equity generally guide themselves by the statute of limitations in determining *laches*. *Brown v. Goodman*, 147 Ill. App. 3d 935, 941, 498 N.E.2d 854 (1986). Passing of the limitations period, moreover, obviates the requirement of prejudice on the part of the defendant. *Schlossburg v. Corrington*, 80 Ill. App. 3d 860, 865, 400 N.E.2d 73 (1980).

Since the statute of limitations for written contracts is 10 years, the issue does not arise as to the contract claims. 735 ILCS 5/13—206 (West 1994). But the other claims are governed by a five-year limit as "civil actions not otherwise provided for." 735 ILCS 5/13—205 (West 1994).

■ More than five years passed between the alleged fraud and the filing of this suit. Golden, however, argues that the limitations period should be tolled because he did not learn of the facts that formed the basis of his complaint until he conducted discovery in the ALAS case.

The statute of limitations begins to run when "the injured person [is] possessed of sufficient information concerning his injury and its cause to put a reasonable person on inquiry to determine whether actionable conduct is involved." *Knox College v. Celotex Corp.*, 88 Ill. 2d 407, 416, 430 N.E.2d 976 (1981).

■ Golden argues that the fiduciary relationship should have released him from the duty to make inquiries. Although it is difficult to fix the precise point when Golden had enough information to put him on inquiry, we conclude that he had enough information by November 7, 1991, when he learned that proper procedures had not been followed in his expulsion. And at that point he was no longer in a fiduciary relationship with the defendants.

If a cause of action is fraudulently concealed, this can toll the running of the limitations period. *Huffman v. Gould*, 327 Ill. App. 428, 436, 64 N.E.2d 773, 777 (1945). However, the fact that fraud forms the basis of Golden's causes of action does not show that the causes of action themselves were fraudulently concealed. *Skrodzki v. Sherman State Bank*, 348 Ill. 403, 406, 181 N.E. 325 (1932); *Zagar v. Health & Hospitals Governing Comm'n*, 83 Ill. App. 3d 894, 898, 404 N.E.2d 496 (1980). On the contrary, Meadows is alleged to have told Golden up front that he had been expelled in contravention of the partnership agreement and that the settlement agreement, contrary to what other partners had said, was quite harsh. Accordingly, even if Golden's non-contract claims were not barred by ratification of the release, they would be barred by *laches*.

For the foregoing reasons, the judgment of the trial court is affirmed.

Affirmed.

GORDON, P.J., and WOLFSON, J., concur.