824 So.2d 172 (2001)
FIRST UNION NATIONAL BANK, Appellant/Cross-Appellee,
v.
Helen J. TURNEY, Appellee/Cross-Appellant.
No. 1D00-2803.
District Court of Appeal of Florida, First District.
November 26, 2001.
Rehearing Denied January 17, 2002.
*174 Virginia B. Townes, Esquire, Stacey L. Cole, Esquire of Akerman, Senterfitt & Eidson, P.A., Orlando and E. Lanny Russell, Esquire of Smith, Hulsey & Busey, Jacksonville, for Appellant/Cross-Appellee.
Thomas S. Edwards, Jr., Esquire of Peek, Cobb, Edwards & Ashton, P.A., Jacksonville and James L. Ford, Sr., Atlanta, for Appellee/Cross-Appellant.
BENTON, J.
First Union National Bank (First Union) appeals the final judgment entered in favor of Helen J. Turney, the beneficiary of a trust First Union's predecessors administered for more than a decade following Robert Turney's death. During this period, the jury found, breaches of fiduciary duty cost Mrs. Turney $1,517,707.04. On appeal, First Union contends that the statute of limitations bars Mrs. Turney's claims, that Mr. Turney waived a conflict of interest (that arose after his death), that the evidence did not support the damage awards, compensatory or punitive ($2,000,000), that "the jurors demonstrated a failure to set aside their sympathies and to behave appropriately," and that the trial court erred in allowing documents in evidence over First Union's objection that they fell within the attorney-client privilege.
We affirm both on First Union's appeal and on Mrs. Turney's cross-appeal, addressing only First Union's contention that it is entitled to a new trial because certain correspondence and memoranda between bank officers and legal counsel (inside and outside the bank) came in evidence, despite objections on grounds the bank's attorney-client privilege protected them from disclosure. At least one letter should have been excluded, but that letter was merely cumulative to other evidence to which no objection was made. The documents received over objection on attorneyclient grounds which were likely to have affected the outcome below fell within the crime-fraud exception to the attorney-client privilege.

Trusts Created
Mr. Turney and his son Tom held all the stock of Port Comfort Marina, Inc., (Port Comfort) on March 22, 1982, when Port Comfort sold the marina property it owned in Fort Myers to Port Sanibel, Ltd. (Port Sanibel), a limited partnership controlled by the Wilbur Boyd family of Bradenton. Port Comfort took back a note in the principal amount of $2,972,000, secured by a purchase money mortgage on the marina *175 property, subject to an agreement (set out in the contract for sale) to subordinate the purchase money mortgage on certain conditions, if Port Sanibel obtained construction loans from other lenders on specified terms. Upon Port Comfort's dissolution, Robert Turney ended up with a 62.8 per cent interest in the note and purchase money mortgage, which he assigned to a revocable inter vivos trust on July 2, 1982, nine days after Florida National Bank of Jacksonville had been named trustee.
With Robert Turney's death on September 19, 1982, Robert's share of the note secured by the purchase money mortgage became the property of two irrevocable trusts. Robert's daughter, Jane Whitener, was the sole beneficiary of one of the irrevocable trusts. The other irrevocable trust, of which his widow Helen was sole income beneficiary, took a 40.6 per cent share of the inter vivos trust's assets, consisting almost entirely of 25.5 per cent of the Port Sanibel note and the purchase money mortgage that secured it. Initially, the Florida National Bank of Jacksonville carried Helen's irrevocable trust's interest in the note on its books at a value of $757,860.

Loan From Affiliate
Port Sanibel never obtained a construction loan that met the conditions for subordination spelled out in the agreement for sale of the marina property. Port Sanibel asked the Turneys to subordinate the purchase money mortgage nevertheless to a mortgage securing a loan Florida National Bank of Miami offered to make to Port Sanibel. Port Sanibel furnished the Turneys a copy of the Miami bank's commitment letter, which contemplated a loan to be repaid within eighteen months.[1] At the time, the Florida National Bank of Jacksonville and the Florida National Bank of Miami were separately chartered national banks each wholly owned by Florida National Banks of Florida, Inc.[2]
Mr. Turney, who had retained authority to manage the inter vivos trust's assets, and his son Tom responded by letter to Port Sanibel on August 30, 1982, offering to subordinate the purchase money mortgage so the loan from the Miami bank could close on the terms stated in the commitment letter if certain additional conditions were also met. One new condition was that four of the Boyds "contractually commit," jointly and severally, to guarantee personally to Tom Turney and the trust that the Miami bank loan would be repaid on time and that all other obligations under the loan agreement would be discharged on or before the date the loan became due.[3]
*176 On October 10, 1982, after Robert Turney's death, the Florida National Bank of Miami closed on a loan to Port Sanibel in the amount of $1,180,000. Thereafter, Port Sanibel asked the Florida National Bank of Jacksonville to subordinate the purchase money mortgage it held as trustee (and escrow agent for Tom) to the mortgage securing repayment of the Miami bank loan. Accompanying this request was a letter signed by the four individuals whose personal guarantees Mr. Turney had sought. Each of the four specified members of the Boyd family gave personal guarantees to the Florida National Bank of Jacksonville, as trustee, guaranteeing the timely discharge of Port Sanibel's obligations to the Florida National Bank of Miami under the loan agreement. (Three of them also gave separate guarantees to the Florida National Bank of Miami, guaranteeing repayment of the loan.)
On November 1, 1982, without seeking court approval and without informing Mrs. Turney, the Florida National Bank of Jacksonville subordinated the purchase money mortgage to the mortgage securing repayment of the loan to the Florida National Bank of Miami. The subordination was unconditional. At the time, lawyers advised the Florida National Bank of Jacksonville that it need not seek court approval or tell Mrs. Turney that a conflict of interest existed in order to subordinate the purchase money mortgage to the mortgage securing the note in favor of the Miami bank.[4] At all pertinent times, Mrs. Turney had full authority under the trust instrument to name a new trustee in order to avoid any conflict of interest of which she was apprised (or for any other reason).
A memorandum dated December 17, 1982, from John R. Crawford, Esq., to a Jacksonville bank trust officer stated:
We all [except for Mrs. Turney, the jury later necessarily found] recognize, of course, that a potential conflict of interest exists. It is probable, in fact, that the Trustee will be held to a higher standard of care in this situation than it would if the first mortgage were held by an unaffiliated party. At the first indication that the Trustee may encounter difficulty in collecting the mortgage, the Bank will have to either resign as trustee (and its position as escrow agent for the other mortgagee) or, at a minimum, petition the Court to appoint a trustee pendente lite until the situation is resolved.
First Union called Mr. Crawford as its witness and examined him about this memorandum, which had come in without objection.

Remedies Forgone
In the fall of 1984, as time for an interest payment due on the note secured by the purchase money mortgage approached, Port Sanibel sought to renegotiate the note's terms and postpone the payment, but these efforts proved unavailing. Port Sanibel did not make the interest payment due September 30, 1984, until October 31, *177 1984, outsidealbeit only by a daythe thirty-day grace period the note allowed.
By this time, Florida National Bank's Miami branch had twice extended the deadline for repayment of the money Port Sanibel had borrowed there. But with the written consent of the trusts' beneficiaries obtained from Mrs. Turney without informing her of the Miami branch's loan extensionsFlorida National Bank's Jacksonville branch accepted Port Sanibel's interest payment late.
The Florida National Bank did not inform Mrs. Turney of its conflict of interest, resign, or seek court approval for its actions. It also ignored Mr. Crawford's advice that, at the first sign that Port Sanibel might have difficulty meeting its obligations to the trusts, the bank would have to resign as trustee or seek appointment of a trustee pendente lite. Even though the principal owed the trusts was not due for another three years, the late interest payment and the Miami branch's loan extensions gave additional reason to believe that the Florida National Bank's Jacksonville branch might encounter difficulty in collecting on the note secured by the purchase money mortgage.
Under the contractual commitments four of the Boyds had jointly and severally given, they were personally responsible to the trusts for repayment on or before October 8, 1984if not six months earlierof the money Port Sanibel had borrowed from the Florida National Bank of Miami.[5] Uncontroverted evidence showed that they had sufficient personal assets to pay Port Sanibel's loan debt to the Florida National Bank at all pertinent times.
Repayment of the loan with the Boyds' personal funds would have restored the security interest the trusts originally had in the marina property. On the other hand, Florida National Bank's decision not to demand that the Boyds repay Port Sanibel's loan and restore the trusts' security position (instead of granting extensions on the Miami loan) made it possible for the Miami branch to earn additional interest.
The Florida National Bank never advised Mrs. Turney that the Boyds had given the trust personal guarantees or that they had breached their contractual undertaking to the trust by failing to repay the Miami loan within the time the commitment letter had specified.

Foreclosures and Termination
In 1985, The County Bank of Bradenton extended a line of credit and made at least two loans to Port Sanibel. Port Sanibel used a portion of The County Bank loan proceeds to repay Florida National Bank's Miami branch. Although Florida National Bank did not accede to Port Sanibel's request to subrogate the purchase money mortgage it held (as trustee and escrow agent) to the mortgage Port Sanibel was to give The County Bank as security for the new loans, the mortgage Port Sanibel later gave The County Bank included a general subrogation clause.
*178 On February 13, 1987, the Florida Comptroller shut The County Bank down. The following month, Port Sanibel defaulted on the note secured by the purchase money mortgage Florida National Bank held. In April of 1988, Florida National Bank (as trustee and escrow agent) filed a complaint to foreclose the purchase money mortgage. By this time, the Federal Deposit Insurance Corporation (FDIC) had acquired the mortgage Port Sanibel had given The County Bank. In response to Florida National Bank's foreclosure complaint, the FDIC counterclaimed, asserting first priority for the mortgage it had obtained from The County Bank, based on the subrogation clause in that mortgage, and on its contention that the loans from The County Bank met the construction loan conditions set out in the contract of sale between Port Comfort and Port Sanibel.
After the FDIC had removed the foreclosure proceeding to federal court, Tom Turney, Port Sanibel, the FDIC and Florida National Bank's successor entered into a settlement agreement.[6] As a result of the settlement, the FDIC obtained legal title to the marina property as security for $450,000 plus interest from the date of the settlement, October 10, 1990. The settlement agreement called for Tom Turney and the trusts to sell the marina property within three years and for distribution of sale proceeds, over and above expenses and what the FDIC was owed, to Tom Turney and the trusts.
Three years elapsed and the marina property remained unsold. As contemplated by the settlement agreement in that event, the FDIC foreclosed, and the marina property was eventually auctioned for $1,650,000. After the FDIC received some $850,000 to satisfy its lien and after other expenses totaling approximately $180,000 were paid, the remainder of the sale proceeds was allocated to Tom Turney and the two trusts. Mrs. Turney's trust received $160,044.62. The First Union National Bank of Florida, Inc. (which had acquired Florida National Bank) deducted accrued fees and terminated Mrs. Turney's trust in 1995 after making a final distribution to her in the approximate amount of $32,000. (Ms. Whitener received nothing because her trust had a negative balance.)

Stepdaughter Complains First
After receiving her last distribution in 1987, Ms. Whitener raised questions about the bank's administration of the trusts as early as 1988. It was then that the bank retained outside counsel, William G. Cooper, Esq., to respond to Ms. Whitener's concerns or, as one unobjected to in-house memorandum put it, "to protect our corporate hindside."
The trusts held certain dock construction permits that were to expire in November of 1988. Mr. Cooper advised the bank against acceding to Ms. Whitener's demands *179 that the bank lend the trusts money to finance construction of the docks, opining that the FDIC's claim of priority made it uncertain whether any money spent to construct docks would ever be recovered. The bank accepted his advice in this regard and advised Mrs. Turney of its decision by letter dated September 26, 1988.
The trial court found that Mr. Cooper, whom Florida National Bank originally paid from a corporate account, acted in good faith at all times, including when he wrote a letter on September 21, 1988, the only communication from him which was received in evidence at trial over objection on attorney-client privilege grounds. In the letter, he advised the bank:
In our capacity as counsel for the Trustee in its corporate capacity ... I believe the trustee should give consideration to filing a suit for declaratory judgment ... for the purpose of terminating the trust and distributing the respective shares of the purchase money mortgages or, if appropriate[,] percentages of the foreclosed property directly to the beneficiaries under the circumstances presented.
We suggest this because it is apparent that the beneficiaries are going to, in all probability, file suit against the trustee despite the broad discretion granted the trustee under the trust instrument....
. . . .
While, at first blush, this may appear to be a harsh step, I candidly believe it is precisely what the beneficiaries are asking for. On the one hand, they make demands on what the trustee should, or should not do, with threats of litigation, and yet in the same breath try and take a "hands off" approach indicating that the trustee is supposed to take care of the asset and see to it that they have available cash to be distributed in the form of income. It seems to me that a procedure such as this could be implemented at the same time the foreclosure proceeds toward trial.
The bank rejected his advice to file suit for declaratory judgment on its behalf, but retained him to represent the trusts in the foreclosure action the trusts had by then already brought. Sherry Lubeck, a manager of the bank's trust department, arranged for him to meet with Mrs. Turney to discuss the foreclosure proceeding on September 30, 1988.
Ms. Lubeck later wrote Mrs. Turney and recommended settling the foreclosure suit on the terms Mr. Cooper had negotiated with the FDIC and Tom Turney, but stated:
[Y]ou are free to seek independent legal counsel to represent your interests. It is my opinion that we have retained excellent attorneys to act on the Trust's behalf and that they are working diligently to bring [the foreclosure] to a conclusion.
Mr. Cooper was one of the "excellent attorneys" to which the letter referred, Ms. Lubeck testified. Without retaining independent counsel, Mrs. Turney accepted the recommendation to settle.

Bank Considers Options
After Donald Bishop replaced Ms. Lubeck as the trust officer responsible for the Turney trusts, he "question[ed] the advisability of [the bank's] continuing to serve as Trustee," in a memorandum to an attorney dated April 6, 1992. The memorandum inquired:
If we resign is there a statute of limitations that would limit their right to file a lawsuit? We believe the beneficiaries have very limited funds and would find it difficult to initiate any legal action at this time.
*180 In a memorandum to Lee M. Evans, another bank officer, dated May 12, 1992, Mr. Bishop reported that he had discussed the option of resigning with several lawyers. According to this memorandum, John Abdallah, Esq., recommended giving thirty days' notice of intent to resign and furnishing the beneficiaries an accounting along with the notice.
In a handwritten note on the memorandum dated May 15, 1992, Mr. Abdallah indicated that providing an accounting would start a six-month statutory limitations period running. In another handwritten note elsewhere on the same memorandum, Mr. Evans suggested providing an accounting immediately and then resigning in six months.
On July 8, 1992, the bank provided a comprehensive accounting for the first time in about four years. Like the accountings that preceded it, this accounting made no mention of any of the conflicts of interest First Union's predecessors had encountered in administering the trust.
Thereafter, in a handwritten document dated August 7, 1992, Mr. Abdallah expressed various concerns about resigning. Finally, in a memorandum dated October 4, 1993 (which the trial judge considered but which the jury never saw), Mitchell E. Cook, Esq. opined that the six-month statute of limitations cut off only suits brought by beneficiaries, and raised the possibility that a successor trustee might bring suit against First Union at any time before a four-year statutory limitations period expired.

Stepdaughter Files Objections
Ms. Whitener filed an objection to the accounting in early 1993, claiming that the bank had breached its fiduciary duty when it subordinated the trusts' purchase money mortgage to the mortgage securing the Miami loan, in its handling of the FDIC litigation, by allowing the dock construction permits to expire unused, and in its marketing of the marina property. To defend the bank against these claims, Gail Fagan, who had begun as in-house counsel for the bank in April of 1990, retained outside counsel, L. Jeffrey Young, Esq.
In a memorandum dated September 28, 1993, Ms. Fagan offered the opinion that any claim based on subordination of the note securing the purchase money mortgage was barred by the statute of limitations. In this memorandum, she also discussed the other claims raised by the Whiteners, all of which Mrs. Turney could also have raised (and eventually did).
In a memorandum dated November 18, 1992, Laurence W. Howard III, Esq., had recommended that the bank consider lending the trusts money to buy out the FDIC's interest in the marina property:
[I]t appears that a loan to the trust secured by a first mortgage appears to be the best alternative. The proceeds of the loan could then be used to purchase the FDIC's interest in the property.... It is advised, however, that prior to entering into such a transaction, you obtain... a waiver and release of any claims or causes of action which the trust, its beneficiaries, or Robert K. Turney [sic] may have.
In a memorandum dated September 23, 1993, Timothy L. Flanagan, another attorney, indicated that the bank was continuing to explore this option.
The Flanagan memorandum, which came in evidence over objection, was largely concerned with the income tax consequences of the trusts' reacquiring title to the marina property, in the event the bank lent money for that purpose. But it also stated:
However, I think the bank is looking for an opinion from us and we want to really be sure that we take a very good *181 look at every issue on this matter. I would even ask that you look back at my initial research on the triggering of the gain and be sure that we have covered all of our bases. Jeff also asked if we had any thoughts on any regulatory problems with this. I asked him if what he meant was the conflicts as between the trust and the bank and although he said yes to that that if there were any others. I don't really think we want to get into giving an opinion on that and I think we should probably limit the scope of our analysis to tax matters. The possible exception, is we could simply allude to conflicts that the bank may have in making the loan if the bank is also the trustee.
Even though the memorandum had mainly to do with a tax issue, the trial court was entitled to conclude that it also advanced the bank's plan to obtain releases extinguishing the beneficiaries' claims on account of past breaches of fiduciary duty.[7]
Ms. Turney and her son-in-law both testified at trial that they were never advised that any bank had any conflict of interest during its administration of the trusts. The evidence suggested that Mrs. Turney did not regularly communicate with her stepchildren. Ms. Fagan acknowledged that the bank did not, as far as she knew, ever inform Mrs. Turney of any conflict or of the nature of any claim that she might be giving up by executing the release the bank sought.
According to Mr. Young, who negotiated with the beneficiaries, the bank offered to lend money to the trusts so they could protect their interest in the note by buying out the FDIC, but only if the beneficiaries agreed to release all prior claims against the bank. In the end, the beneficiaries rejected the offer because the parties could not agree on the terms of the release provision.

Claim of Privilege Litigated
On April 24, 1996, Mrs. Turney filed her own complaint against First Union's predecessor alleging breaches of fiduciary duty in the administration of the trust. She later filed an amended complaint, which also sought both compensatory and punitive damages.
On October 2, 1997, she filed a motion for in camera inspection of documents as to which the bank was asserting an attorney-client privilege. Attached to the motion were certain documents which had been obtained in the course of discovery in the Whitener litigation, and a list of other documents.
As to letters written by Mr. Cooper, Mrs. Turney's motion asserted that the privilege was unavailable because the bank had retained Mr. Cooper in "dual and competing roles with obligations that flowed to two distinct clients under the law" by seeking advice from Mr. Cooper "for the express purpose of setting up defenses against th[e] beneficiaries" while also directing him to handle litigation on behalf of the trust and introducing him to Mrs. Turney "as an attorney who was representing the trust and acting to protect [the beneficiaries'] interests."
The motion came on for hearing on October 30, 1997. Although First Union reserved the right to put on additional evidence, it affirmatively waived any objection to the trial judge's examining documents *182 it claimed its attorney-client privilege protected in determining whether the claims of privilege should be sustained. First Union's trial counsel stated:
I think you'd have to go through every communication, every piece of work product produced by the 15 lawyers over a period of 1988 to 1995 and decide whether any of those rise to the level of a prima facie concern in the court's mind that would require an evidentiary hearing. We're not averse to that proceeding, but it seems to put an awful burden on the court.
Thereafter First Union's attorney put on testimony concerning the three letters Mr. Cooper had written. (Only one of these, set out in substance, ante at 179, came in over objection at trial.) The trial court acquiesced when the parties suggested that the other documents in dispute be examined in camera at a later time.
At the conclusion of the initial hearing, the trial court ruled that the attorney-client privilege was waived as to the three letters Mr. Cooper wrote, declaring that Mr. Cooper was involved in "dual representation" when he met with Mrs. Turney. On November 15, 1997, the trial court entered a written order reiterating its conclusion that the privilege did not protect the Cooper letters, and granting Mrs. Turney's request for an in camera inspection of the remaining documents.
On February 5, 1998, after in camera inspection of numerous documents, the trial court entered an order concluding that more than 150 documents were not privileged. (Ultimately only eight of these documents were received in evidence at trial over objection.) The bank filed a motion on February 10, 1998, requesting a full evidentiary hearing as to each document (other than the Cooper letters) that the court had found not to be privileged. The trial court granted the motion and held evidentiary hearings on February 25, 1998, and on June 29, 1998.
On September 18, 1998, the trial court, having heard all of First Union's evidence, entered an order reaffirming the rulings in the order entered on February 5, 1998, and again concluded that the attorney-client privilege gave way to the crime-fraud exception. The trial court initially ruled that the Fifth District's decision in Whitener was based solely on procedural deficiencies and so was not controlling, then identified two issues for decision:
1. was there fraud on the part of the Defendant (with or without the knowledge and participation of the Defendant's attorney) and
2. if there was fraud, was/were the attorney(s) hired to conceal or advance the fraud (again with or without the knowledge of the attorney(s)).
The trial court found that "[b]ased on all of the evidence and testimony heard by this Court, the trier of fact can find that misconduct of this Defendant rises to the level of fraud and while the attorneys may not have known why they were hired, they can be found to have been hired to aid the Defendant in that fraud."[8]
*183 First Union petitioned this court for certiorari review of the September 18, 1998 order. On March 9, 1999, we denied the petition for writ of certiorari per curiam without opinion.

Initial Showing Waived
Because of First Union's waiver, the procedure followed below differs from the procedure described in American Tobacco Co. v. State, 697 So.2d 1249, 1256 (Fla. 4th DCA 1997), under which a party seeking to defeat a claim of attorney-client privilege on crime-fraud grounds must first put on a prima facie case that the crime-fraud exception applies. Under American Tobacco, the moving party must make out a prima facie case[9] that the party asserting the attorney-client privilege employed counsel or sought a lawyer's advice in order to commit, or in an attempt to commit, some crime or fraud. See Clark v. United States, 289 U.S. 1, 15, 53 S.Ct. 465, 77 L.Ed. 993 (1933); United States v. Collis, 128 F.3d 313, 321 (6th Cir.1997); In re Richard Roe, Inc., 68 F.3d 38, 40 (2d Cir.1995); Olson v. Accessory Controls and Equip. Corp., 254 Conn. 145, 757 A.2d 14, 30-31 (2000).
The disputed documents themselves cannot be used for this purpose, unless the party asserting the privilege consents. See First Union Nat'l Bank v. Whitener, 715 So.2d 979, 983-84 (Fla. 5th DCA 1998); see also United States v. Zolin, 491 U.S. 554, 568-72, 109 S.Ct. 2619, 105 L.Ed.2d 469 (1989); Caldwell v. Dist. Court, 644 P.2d 26, 33 (Colo.1982); In re Marriage of Decker, 153 Ill.2d 298, 180 Ill.Dec. 17, 606 N.E.2d 1094, 1106-07 (1992). Absent agreement otherwise, the trial judge should not examine written communications between attorney and client, unless the party seeking to establish the crime-fraud exception adduces competent evidence, apart from the disputed documents, that would lead a reasonable person to believe that such an examination would reveal that the communications were part of an effort to perpetrate some crime or fraud. See Zolin, 491 U.S. at 572, 109 S.Ct. 2619 ("Before engaging in in camera review to determine the applicability of the crime-fraud exception, `the judge should require a showing of a factual basis adequate to support a good faith belief by a reasonable person,' Caldwell v. District Court, 644 P.2d 26, 33 (Colo.1982), that in camera review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies.").
Even if in camera inspection makes it appear that the crimefraud exception applies, a full evidentiary hearing is necessary (unless waived by the proponent of the privilege), before confidential communications between attorney and client can be disclosed to another party. See First Union Nat'l Bank, 715 So.2d at 983-84; American Tobacco Co., 697 So.2d at 1256. "When communications appear on their face to be privileged [or the privilege *184 is otherwise established], the party seeking disclosure bears the burden of proving that they are not." Shell Oil Co. v. Par Four P'ship, 638 So.2d 1050, 1050 (Fla. 5th DCA 1994). See Robichaud v. Kennedy, 711 So.2d 186, 188 (Fla. 2d DCA 1998); Cone v. Culverhouse, 687 So.2d 888, 892 (Fla. 2d DCA 1997); The Haskell Co. v. Georgia Pac. Corp., 684 So.2d 297, 298 (Fla. 5th DCA 1996).
These predicate factual questions fall to the trial court for decision under a preponderance of the evidence standard.[10]See § 90.105(1), Fla. Stat. (1999) ("[T]he court shall determine preliminary questions concerning... the existence of a privilege, or the admissibility of evidence."); Romani v. State, 542 So.2d 984, 985 & n. 3 (Fla.1989); American Tobacco Co., 697 So.2d at 1256 ("When a finder of fact `weighs' evidence, we know of no lesser burden to apply to the proof than a preponderance of evidence...."); see also Brooks v. State, 787 So.2d 765, 778 (Fla.2001) (holding that the state must prove the existence of a conspiracy by "a preponderance of the evidence independent of the hearsay statements sought to be admitted."); Foster v. State, 679 So.2d 747, 753 (Fla.1996) (same); see generally Charles W. Ehrhardt, Florida Evidence § 803, at 699 & n. 10 (Ed. 2001); 1 Wigmore, Evidence § 17 n. 20, at 771-72 (Tillers rev.1983).
In the present case, First Union invited the trial court to review the documents it claimed were privileged, waiving the requirement that Mrs. Turney make a preliminary showing without resort to the documents. Only because of this concession *185 was the trial court's examination of the disputed documents proper, in initially determining whether the evidence of fraud was sufficient to require an evidentiary hearing. Once it examined the documents, the trial court concluded that an evidentiary hearing was necessary, and conducted a full evidentiary hearing before making its final ruling.

Standard of Review
We now review the trial court's conclusions of law de novo, and its findings of fact (including any findings its ruling necessarily implies) to determine whether they are supported by competent, substantial evidence. "If there is any theory upon which the trial court might properly have [made its interlocutory ruling], then the district court was correct in affirming, even though the trial court's stated or indicated reasons be erroneous. Cohen v. Mohawk, Inc., 137 So.2d 222 (Fla.1962)." Stuart v. State, 360 So.2d 406, 408 (Fla. 1978); See Savage v. State, 156 So.2d 566, 568 (Fla. 1st DCA 1963) ("If a trial judge's order ... is sustainable under any theory revealed by the record on appeal, notwithstanding that it may have been bottomed on an erroneous theory, an erroneous reason, or an erroneous ground, the order ... will be affirmed." (footnotes omitted)).

Trustee Enjoys Privilege
The attorney-client privilege plays an essential role in the adversary system. The ability of client and attorney to communicate with one another in confidence is central to our system of administering justice. "The attorney-client privilege is the oldest confidential communications privilege known in the common law." American Tobacco Co., 697 So.2d at 1252. The privilege exists even though the client is a corporation. See Southern Bell Tel. v. Deason, 632 So.2d 1377, 1383 (Fla.1994).
It is ... not only an interest long recognized by society but also one traditionally deemed worthy of maximum legal protection. "Its purpose is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice. The privilege recognizes that sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon the lawyer's being fully informed by the client." Upjohn Co. v. United States, 449 U.S. 383, 389, 101 S.Ct. 677, 682, 66 L.Ed.2d 584 (1981). The privilege "rests on the need for the advocate and counselor to know all that relates to the client's reasons for seeking representation if the professional mission is to be carried out." Trammel v. United States, 445 U.S. 40, 51, 100 S.Ct. 906, 913, 63 L.Ed.2d 186 (1980).
American Tobacco Co., 697 So.2d at 1252 (quoting Haines v. Liggett Group, Inc., 975 F.2d 81, 90 (3d Cir.1992)). The privilege came into existenceand has been protected assiduously sinceto serve these important purposes by encouraging clients to disclose their circumstances fully to lawyers whose assistance they seek in ascertaining their legal rights and obligations. Even "a client who in the past has committed a wrongdoing is entitled to confidential communications and advice from an attorney." First Union Nat'l Bank, 715 So.2d at 983.
An attorney retained to represent a trust represents the trustee, not the beneficiaries. See Barnett Banks Trust Co. v. Compson, 629 So.2d 849, 851 (Fla. 2d DCA 1993). Even though the lawyer's fees are paid with trust moneys that would otherwise go to trust beneficiaries, the *186 trustee is the client. See Barnett Banks Trust Co., 629 So.2d at 851. But see Talbot v. Marshfield, 62 Eng. Rep. 165 (Ch. 1865). A lawyer a trust retains to protect trust assets from third parties is employed by and works for the trustee. The ethical prohibition against simultaneously representing different parties with adverse interests does not therefore apply.[11]Cf. R. Regulating Fla. Bar 4-1.7(a) (barring a lawyer from representing adverse interests unless the lawyer reasonably believes that representation will not adversely affect the interests of both clients and the clients consent after consultation). As a trust's lawyer, an attorney represents a single client, the trustee.
We need not decide in the present case whether a "fiduciary exception" to the attorney-client privilege exists in Florida. Compare Wells Fargo Bank v. Superior Court, 22 Cal.4th 201, 91 Cal.Rptr.2d 716, 990 P.2d 591, 597 (2000) (finding no such exception in California); Huie v. DeShazo, 922 S.W.2d 920, 925 (Tex.1996) (finding no such exception in Texas) with Wildbur v. ARCO Chem. Co., 974 F.2d 631, 645 (5th Cir.1992) ("When an attorney advises a[n] [ERISA] plan administrator or other fiduciary concerning plan administration, the attorney's clients are the plan beneficiaries for whom the fiduciary acts, not the plan administrator."); Riggs Nat'l Bank v. Zimmer, 355 A.2d 709, 711, 713-14 (Del. Ch.1976) (holding beneficiaries entitled to discover communications between trustees and trust's lawyer if "the legal assistance to the trustees [is] rendered only in their service to the beneficiaries"). The communications in dispute all pertain to the bank's interests over against those of the trust beneficiary, Mrs. Turney. The bank has not contended that a request for communications between trustee and counsel is unreasonable,[12] where the communications pertain to matters in which the bank's interests coincide with Mrs. Turney's.

Crime-Fraud Exception Can Defeat Privilege
If a client communicates with an attorney in order to obtain advice or assistance *187 in perpetrating what the client knows to be a crime or fraud, the communication loses its privileged character. See Kneale v. Williams, 158 Fla. 811, 30 So.2d 284, 287 (1947) ("It appears to be well settled that the perpetration of a fraud is outside the scope of the professional duty of an attorney and no privilege attaches to a communication and transaction between an attorney and client with respect to transactions constituting the making of a false claim or the perpetration of a fraud."); State v. Marks, 758 So.2d 1131, 1133 n. 2 (Fla. 4th DCA 2000). The evidence code provides:
(4) There is no lawyer-client privilege under this section when:
(a) The services of the lawyer were sought or obtained to enable or aid anyone to commit or plan to commit what the client knew was a crime or fraud.
§ 90.502, Fla. Stat. (1987). The "crime-fraud exception to the attorney-client privilege... assure[s] that the `seal of secrecy,'... between lawyer and client does not extend to communications `made for the purpose of getting advice for the commission of a fraud' or crime." American Tobacco Co., 697 So.2d at 1253 (quoting United States v. Zolin, 491 U.S. 554, 563, 109 S.Ct. 2619, 105 L.Ed.2d 469 (1989)); See Anderson v. State, 297 So.2d 871, 875 (Fla. 2d DCA 1974) ("The attorney-client privilege cannot prevent the disclosure of communications made in contemplation of a crime or the perpetration of a fraud."). Under the statute, it is immaterial whether the lawyer knows that the client intends to commit a crime or perpetrate a fraud, so long as the client has the intention to do so sometime in the future.
It is one thing to seek legal advice about existing conditions or the consequences of past actions and another to seek legal advice about or services for a future course of action. Wigmore "draws a distinction as to whether the fraud was committed before or after the attorney was hired. See 8 Wigmore, Evidence § 2298 (McNaughton rev.1961). See also McCormick on Evidence Vol. 1, § 95 (4th ed.1992)." First Union Nat'l Bank, 715 So.2d at 983. While the attorney-client privilege also protects confidential communications about plans for the future, it does so only so long as the communications are not part of a client's plan to act criminally or fraudulently.
The client need not succeed in committing the intended crime or fraud in order to forfeit the attorney-client privilege. The dispositive question is whether the attorney-client communications are part of the client's effort to commit a crime or perpetrate a fraud. See Horning-Keating v. State, 777 So.2d 438, 445-46 (Fla. 5th DCA 2001); Shell Oil Co., 638 So.2d at 1051; see also Cigna Corp. v. Spears, 838 S.W.2d 561, 568-569 (Tex.App.1992). On the other hand, where a client pursues a course of action in good faith which is determined only later to have been criminal or fraudulent, the privilege remains intact. See § 90.502(4)(a), Fla. Stat. (1987).

Exception Did Not Defeat Privilege
The trial court ruled that the crime-fraud exception applied to the bank's communications with Mr. Cooper simply because Mr. Cooper was retained for two disparate purposes: He advised the bank about its fiduciary duties to the trust beneficiaries and he also represented the trusts in their dealings with Port Sanibel and the FDIC. The trial court accepted Mrs. Turney's theory that the attorney-client privilege was unavailable because the bank had retained Mr. Cooper in "dual and competing roles with obligations that flowed to two distinct clients under the law" by seeking advice from Mr. Cooper about possible "defenses against th[e] beneficiaries" while *188 also directing him to handle litigation on behalf of the trust and introducing him to Mrs. Turney "as an attorney who was representing the trust and acting to protect [the beneficiaries'] interests."
In fact, Mr. Cooper represented the trustee and nobody else. In the trust's dealings with Port Sanibel and the FDIC, the trustee's interests coincided with Mrs. Turney's. The bank never told Mrs. Turney that Mr. Cooper represented her personally. On the contrary, she was expressly informed that Mr. Cooper represented the trusts and that she was free to retain her own counsel. As a prudential matter, the bank might have been well advised to steer clear of any possible conflict by retaining different counsel for these separate matters. But giving Mr. Cooper both assignments evinced no fraudulent intent. See Huie, 922 S.W.2d at 926. Nor was the bank obliged to disclose to Mrs. Turney that it had retained Mr. Cooper to advise it about its obligations to her, and her stepdaughter, Ms. Whitener. See id.
The trial court erred in concluding that the crime-fraud exception defeated the attorney-client privilege the bank asserted in its communications with Mr. Cooper. The trial court's error in this regard does not require a new trial, however. Of the three Cooper documents, two were not objected to. The substance of the third, the letter of September 21, 1988, also came in through another exhibit, to which no objection was lodged: A corporate memorandum stating that Mr. Cooper had advised the bank to seek termination of the trusts and that bank officers were researching that option.

Exception Applicable to Deliberate Non-Disclosure During Efforts To Obtain General Release
With respect to other, later documents, however, the trial court was entitled to find that the crime-fraud exception applied because the bank acted fraudulently when it sought to obtain a general release from Mrs. Turney, in exchange for a loan to the trusts to finance purchasing the FDIC's interest in the marina property, without making full disclosure of all material facts.
The issue is not whether a general release given in the absence of full disclosure would actually have extinguished all of Mrs. Turney's rights to recover for breaches of fiduciary duty. Section 173 of the Restatement (Second) of Contracts (1979) provides that
[i]f a fiduciary makes a contract with his beneficiary relating to matters within the scope of the fiduciary relation, the contract is voidable by the beneficiary, unless
(a) it is on fair terms, and
(b) all parties beneficially interested manifest assent with full understanding of their legal rights and of all relevant facts that the fiduciary knows or should know.
(Emphasis supplied.) See Richland Country Club, Inc. v. CRC Equities, Inc., 832 S.W.2d 554, 557 (Tenn.Ct.App.1991) (holding that a release is a type of contract). The question is whether the bank sought to extinguish the claims by fraudulent means, not whether it would have succeeded.
In any transaction with a beneficiary, a fiduciary has an obligation to make full disclosure to the beneficiary of all material facts. Breaches of this duty of disclosure have been held to be fraud. See Donahue v. Davis, 68 So.2d 163, 171 (Fla. 1953). See also Restatement (Second) of Trusts § 170(2) (1957) ("The trustee in dealing with the beneficiary on the trustee's *189 own account is under a duty to the beneficiary to deal fairly with him and to communicate to him all material facts in connection with the transaction which the trustee knows or should know.").
During the time the bank sought the release from Mrs. Turney, the evidence showed, bank personnel were aware that Ms. Whitener had alleged various breaches of fiduciary duty dating back to 1982. A number of the disputed documents reflect this awareness. The bank concedes it took no steps to inform Mrs. Turney of any of the allegations at the time it sought to obtain a general release from her of all claims she might have against the bank. The trial court was entitled to find (as the jury did) that at least some of the alleged breaches of fiduciary duty did occur and that Mrs. Turney was initially, reasonably unaware of them.
The failure to disclose material facts while seeking a release has been held to be fraudulent concealment. See, e.g., Pacelli Bros. Transp. v. Pacelli, 189 Conn. 401, 456 A.2d 325, 328 (1983) ("The intentional withholding of information for the purpose of inducing action has been regarded ... as equivalent to a fraudulent misrepresentation."); Rosebud Sioux Tribe v. Strain, 432 N.W.2d 259, 263 (S.D.1988) ("The mere silence by one under such a [fiduciary] duty to disclose is fraudulent concealment.")
The trial court did not err, therefore, in ruling that the bank's efforts to procure a general release while knowingly failing to disclose material facts made the crime-fraud exception applicable to attorney-client communications the bank undertook to that end. See Street v. J.C. Bradford & Co., 886 F.2d 1472, 1481-82 (6th Cir.1989); Todd v. Deposit Guar. Nat'l Bank, 849 F.Supp. 1149, 1155-56 (S.D.Miss.1994); Golden v. McDermott, Will, & Emery, 299 Ill.App.3d 982, 234 Ill.Dec. 241, 702 N.E.2d 581, 585 (1998) ("Parties in a fiduciary relationship owe one another a duty of full disclosure of material facts when making a settlement and obtaining a release."); Rosebud Sioux Tribe, 432 N.W.2d at 263; see also Garrett v. Moore-McCormack Co., 317 U.S. 239, 246, 63 S.Ct. 246, 87 L.Ed. 239 (1942).

Exception Applicable to Deliberate Non Disclosure In Connection With Plan To Create Grounds For Limitations Defense
Finally, with respect to still other documents, the trial court was entitled to find that, beginning in 1992, the bank consulted its lawyers, not simply for advice about how the statute of limitations worked, but also as part of a scheme involving deliberate concealment thereafter, in order to defeat Mrs. Turney's rights to seek redress for the breaches of fiduciary duty about which Ms. Whitener was already complaining.
As with the bank's efforts to secure a general release by withholding material information, the issue is not whether the bank's scheme would have succeeded[13] in extinguishing Mrs. Turney's *190 rights but whether fraudulently extinguishing her rights was the bank's intention at the time the bank's communications with its attorneys took place. The bank's later abandonment of this plan does not change the analysis. See Marc Rich & Co. A.G. v. United States, 731 F.2d 1032, 1039 (2d Cir.1984) ("The crime or fraud need not have occurred for the exception to be applicable ...").
"[T]he beneficiary is always entitled to such information as is reasonably necessary to enable him to enforce his rights under the trust or to prevent or redress a breach of trust." Restatement (Second) of Trusts § 173 cmt. c. (1959). A trustee's intentional breach of the duty to supply the information is a fraud. A similar rule applies to lawyers, who are also fiduciaries:
If the lawyer's conduct of the matter gives the client a substantial malpractice claim against the lawyer, the lawyer must disclose that to the client. For example, a lawyer who fails to file suit for a client within the limitations period must so inform the client, pointing out the possibility of a malpractice suit and the resulting conflict of interest that may require the lawyer to withdraw.
Restatement (Third) of Law Governing Lawyers § 20 cmt. c. (1998). No lawyer guilty of malpractice nor any trustee aware of a conflict with its beneficiary can, in order to defeat a claim for redress, conspire with (other) counsel to keep the client or beneficiary in the dark, under cover of the attorney-client privilege.
At the instigation of Messrs. Evans and Bishop, the trial court was entitled to find that the bank's lawyers began in 1992, while the bank was still trustee, to take steps designed to set up a defense under the statute of limitations to defeat Mrs. Turney's claims. Importantly, the trial court was further entitled to find that documents created in and after 1992 reflected the bank's intention (and were steps in its plan) to cut off Mrs. Turney's rights, by giving her an accounting while concealing material facts about the bank's breaches of fiduciary duty. Given Mr. Evans's inquiry about "providing accounting now then resign[ing] in 6 months" and Mr. Bishop's observation that "the beneficiaries have very limited funds and would find it difficult to initiate legal action at this time," the trial court could hardly have come to another conclusion.
A fiduciary's deliberate withholding of material information the fiduciary has a duty to disclose constitutes fraudulent concealment. See Nardone v. Reynolds, 333 So.2d 25, 39 (Fla.1976) (noting that a fiduciary's withholding material information may be fraudulent concealment that tolls the statute of limitations), receded from on other grounds by Hearndon v. Graham, 767 So.2d 1179 (Fla.2000); Truitt v. Metro. Mortgage Co., 609 So.2d 142, 143 (Fla. 4th DCA 1992) ("[A]ppellee's violation of its alleged fiduciary duty to disclose information adverse to appellee's interests, *191 if proved, amounted to fraudulent concealment which tolled the statute of limitations."); Troiano v. Troiano, 549 So.2d 1053, 1056 (Fla. 5th DCA 1989); Schafer v. Lehrer, 476 So.2d 781, 783 (Fla. 4th DCA 1985); First Fed. Sav. & Loan Ass'n v. Dade Fed. Sav. & Loan Ass'n, 403 So.2d 1097, 1100-01 (Fla. 5th DCA 1981); Hughes v. Consol-Pennsylvania Coal Co., 945 F.2d 594, 617 n. 3 (3d Cir.1991) (holding attorney's failure to disclose a conflict of interest was fraud supporting an award of damages).
Constructive fraud is possible even in the absence of an intent to deceive. See Taylor v. Kenco Chem. & Mfg. Corp., 465 So.2d 581, 589 (Fla. 1st DCA 1985). But the record here establishes more than constructive fraud because it reveals a trustee's intent to deceive or conceal in order to defeat its beneficiary's rights. Cf. Garner v. Wolfinbarger, 430 F.2d 1093, 1102-04 (5th Cir.1970); Cigna Corp., 838 S.W.2d at 569; see generally, Developments in the Law-Privileged Communication: III. Attorney Client Privilege, 98 Harv. L.Rev. 1501, 1524-29 (1985).[14] We need not, therefore, reach the question whether, as the trial court seemed broadly to conclude, mere "constructive fraud" suffices for purposes of establishing the crime-fraud exception to the attorney-client privilege.[15]
The trial court did not err in ruling that documents embodying attorney-client communications in furtherance of the bank's efforts to defeat Mrs. Turney's (then potential) claims for breach of fiduciary duty by creating grounds for setting up the statute of limitations fell within the crime-fraud exception to the attorneyclient privilege.

Conclusion
A trustee's communications with the trustee's attorneys are confidential. But when, with the help of an attorney, a trustee deliberately sets out to defeat the rights of a beneficiary, by withholding material information in violation of the trustee's fiduciary duty, communications to that end between the trustee and the trustee's attorney fall within the crime-fraud exception to the attorney-client privilege, and lose their confidential character.
Affirmed.
BOOTH and BROWNING, JJ., concur.
NOTES
[1] The record contains two loan commitment letters from the Florida National Bank of Miami to Port Sanibel. The first specifies a loan term of eighteen months and names four members of the Boyd family as guarantors. The second indicates that an initial eighteen-month term could be extended for six months, for an additional fee, and names only three of the Boyds as loan guarantors. The jury was entitled to conclude that Mr. Turney had seen only the first loan commitment letter at the time he (and Tom Turney) offered to subordinate the purchase money mortgage to a mortgage that would secure a loan from Florida National Bank of Miami to Port Sanibel. As it turned out, Port Sanibel did not repay Florida National Bank of Miami even within twenty-four months.
[2] On July 1, 1983, the Florida National Bank of Jacksonville and the Florida National Bank of Miami (among others) merged into a single nationally chartered bank which First Union National Bank of Florida, Inc. acquired on March 1, 1990. On June 5, 1997, First Union National Bank of Florida, Inc. merged with First Union National Bank of North Carolina, Inc. to form First Union.
[3] The August 30, 1982 letter reads:

You will contractually commit to us that all payments required to be made will be made and all other things required to be done pursuant to the note, mortgage and other agreements executed in conjunction with the loan made pursuant to the Commitment Letter will be made or done on or before the due date thereof....
[4] Some, if not all, of this advice proceeded on the erroneous assumption that the Miami bank's loan complied with the conditions for subordination to construction loans specified in the original agreement for sale. But the jury was entitled to conclude and apparently did conclude that neither those conditions nor the conditions specified in the Turneys' letter of August 30, 1982 were met. First Union waived the attorney-client privilege as to legal advice it received in 1982.
[5] W.H. Boyd, Fay T. Boyd, W.H. Boyd, II, and Susan F. Boyd each signed a letter addressed to Tom Turney and the inter vivos trust dated October 18, 1982, stating that

the undersigned contractually commit[] to you that all payments required to be made on the proposed mortgage to Florida National Bank of Miami will be made and that all other things required to be done pursuant to the aforesaid mortgage and the note secured thereby, and other agreements executed in conjunction with the loan, made pursuant to the commitment letter will be made or done on or before the due date thereof.
The Boyds thus undertook to repay the Miami bank by "the due date." The due date agreed to was the due date in the loan commitment letter.
[6] On October 10, 1990, the parties agreed to the following terms:

A) The Port Comfort Marina will be deeded to the FDIC.
B) The FDIC will lease Port Comfort Marina to the Turney Trust and Turney until October 10, 1993.
C) All income from the marina will be used to pay, for the benefit of the marina, property and liability insurance, personal and real property taxes, and maintenance expenses of the marina. The remaining income, if any, will be paid to the FDIC as additional rent.
D) The Turney Trust and Thomas Turney have the right to purchase the marina from the FDIC for a price of $450,000 plus any moneys advanced by the FDIC for the maintenance, repairs, taxes, etc. at the marina and interest at the rate of the Federal Funds rate from October 10, 1990 to the date of the payoff.
E) The Trust has the right to market the marina.
[7] This is so even though the memorandum can be read to refer to regulatory issues and conflicts of interest that might have arisen in the event of a(nother)loan from the bank to the trusts, not to regulatory issues and possible conflicts of interest attributable to past dealings. This document came in with sheaves of others at the close of Mrs. Turney's case and was not mentioned in counsel's closing argument.
[8] The phrasing of the findings may reflect confusion in the case law about the appropriate standard of proof. See the scholarly discussion in American Tobacco Company v. State, 697 So.2d 1249 (Fla. 4th DCA 1997).

While, in our view, once an attorney-client privilege is established, the burden rests with the party seeking to defeat the privilege, we agree with the American Tobacco court that
the trial court must consider the evidence and argument rebutting the existence of the crimefraud exception and must weigh its sufficiency against the case made by the proponent of the exception.
697 So.2d at 1256. The record is clear that the trial court did just that in the present case, after a full evidentiary hearing at which First Union called several witnesses.
We do not read this finding as a statement that the trial court, "the finder of fact" here, could have found but did not find the facts recited. For one thing, the trial court's statement of the issues belies any such interpretation.
[9] Just as the proponent of the privilege has the burden of proof as to facts which give rise to the privilege, the party seeking to abrogate the privilege has the burden to prove facts which would make an exception to the privilege applicable. While it is not clear to us that the burden of proof should shift on these questions, as contemplated by American Tobacco Company, 697 So.2d at 1256, it is clear on this record that the trial judge's ruling did not hinge on allocation of any burden of proof to First Union.
[10] In interpreting the analogous Federal Rule of Evidence 104(a), the United States Supreme Court explained:

We are ... guided by our prior decisions regarding admissibility determinations that hinge on preliminary factual questions. We have traditionally required that these matters be established by a preponderance of proof. Evidence is placed before the jury when it satisfies the technical requirements of the evidentiary Rules, which embody certain legal and policy determinations. The inquiry made by a court concerned with these matters is not whether the proponent of the evidence wins or loses his case on the merits, but whether the evidentiary Rules have been satisfied. Thus, the evidentiary standard is unrelated to the burden of proof on the substantive issues, be it a criminal case, see In re Winship, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), or a civil case. See generally Colorado v. Connelly, 479 U.S. 157, 167-169, 107 S.Ct. 515, 522-523, 93 L.Ed.2d 473 (1986). The preponderance standard ensures that before admitting evidence, the court will have found it more likely than not that the technical issues and policy concerns addressed by the Federal Rules of Evidence have been afforded due consideration. As in Lego v. Twomey, 404 U.S. 477, 488, 92 S.Ct. 619, 626, 30 L.Ed.2d 618 (1972), we find "nothing to suggest that admissibility rulings have been unreliable or otherwise wanting in quality because not based on some higher standard." We think that our previous decisions in this area resolve the matter. See, e.g., Colorado v. Connelly, supra (preliminary fact that custodial confessant waived rights must be proved by preponderance of the evidence); Nix v. Williams, 467 U.S. 431, 444, n. 5, 104 S.Ct. 2501, 2509, n. 5, 81 L.Ed.2d 377 (1984) (inevitable discovery of illegally seized evidence must be shown to have been more likely than not); United States v. Matlock, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974) (voluntariness of consent to search must be shown by preponderance of the evidence); Lego v. Twomey, supra (voluntariness of confession must be demonstrated by a preponderance of the evidence).
Bourjaily v. United States, 483 U.S. 171, 175-76, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987). The United States Supreme Court's interpretation of Rule 104(a) is persuasive authority as to the proper interpretation of section 90.105(1). See Ellis v. State, 622 So.2d 991, 997 (Fla.1993); Whigum v. Heilig-Meyers Furniture, Inc., 682 So.2d 643, 646-47 (Fla. 1st DCA 1996).
[11] An analogy does exist between trust counsel's situation and that of a lawyer representing multiple parties with shared interests. See Restatement (Third) of Law Governing Lawyers § 75(1) & (2) (1998).("(1) If two or more persons are jointly represented by the same lawyer in a matter, a communication of either co-client that otherwise qualifies as privileged ... and relates to matters of common interest is privileged as against third persons.... (2) Unless the co-clients have agreed otherwise, a communication described in Subsection (1) is not privileged as between the co-clients in a subsequent adverse proceeding between them."). See also § 90.502(4)(e), Fla. Stat. (1987), (providing that there is no attorney-client privilege when "[a] communication is relevant to a matter of common interest between two or more clients, or their successors in interest, if the communication was made by any of them to a lawyer retained or consulted in common when offered in a civil action between the clients or their successors in interest."). See generally Wildbur v. ARCO Chem. Co., 974 F.2d 631, 645 (5th Cir.1992); United States v. Evans, 796 F.2d 264, 265-66 (9th Cir.1986); but see Wells Fargo Bank v. Superior Court, 22 Cal.4th 201, 91 Cal.Rptr.2d 716, 990 P.2d 591, 597 (2000); Huie v. DeShazo, 922 S.W.2d 920, 925-26 (Tex.1996); Charles W. Ehrhardt, Florida Evidence § 502.5, at 315 (Ed.2001). This analogy breaks down, however, when the interests of the beneficiaries diverge from the interests of the trustee. See Cone v. Culverhouse, 687 So.2d 888, 892-93 (Fla. 2d DCA 1997); Paskoski v. Johnson, 626 So.2d 338, 339 (Fla. 4th DCA 1993).
[12] Section 737.303, Florida Statutes (1987) ("Duty to inform and account to beneficiaries"), requires a trustee to honor a beneficiary's "reasonable" request for information concerning "the particulars relating to administration" of the trust. Section 737.303, which should be construed in pari materia with statutory provisions governing the attorney-client privilege, does not in terms abrogate any privilege, however.
[13] Section 737.307, Florida Statutes (1991), provides that "an action against a trustee for breach of trust is barred for any beneficiary who has received a final, annual, or periodic account or other statement fully disclosing the matter unless a proceeding to assert the claim is commenced within 6 months after receipt of the final, annual, or periodic account or statement." (Emphasis supplied.)

The bank never disclosed the breaches of fiduciary duty upon which Ms. Turney ultimately sued. See Harris Trust Co. v. Davis, 668 So.2d 689, 689-90 (Fla. 4th DCA 1996). The jury found Ms. Turney was reasonably unaware of the bank's breaches of fiduciary duty for some time. Her causes of action did not accrue until she became aware of facts that would have put a reasonable person on notice. See Monahan v. Davis, 781 So.2d 436, 438 (Fla. 4th DCA 2001); Grossman v. Greenberg, 619 So.2d 406, 408-09 (Fla. 3d DCA 1993). See generally Hearndon v. Graham, 767 So.2d 1179 (Fla.2000). "[A] cause of action does not accrue until the plaintiff either knows or reasonably should know of the tortious act giving rise to the cause of action." Hearndon, 767 So.2d at 1184; Monahan, 781 So.2d at 438; see Van Dusen v. Southeast First Nat'l Bank, 478 So.2d 82, 91-92 (Fla. 3d DCA 1985) (declaring "the general rule in Florida is that `a statute of limitations begins to run when there has been notice of an invasion of legal rights or a person has been put on notice of his right to a cause of action.' Kelley v. School Board of Seminole County, 435 So.2d 804, 806 (Fla.1983)."); Green v. Bartel, 365 So.2d 785, 787 (Fla. 3d DCA 1978).
[14] See generally Harrell v. Branson, 344 So.2d 604, 607 (Fla. 1st DCA 1977) (stating that constructive fraud "is deemed to exist where a duty under a ... fiduciary relationship has been abused.") (quoting Douglas v. Ogle, 80 Fla. 42, 85 So. 243 (1920)); Steelvest, Inc. v. Scansteel Serv. Ctr., 807 S.W.2d 476, 487 (Ky. 1991) (holding, with regard to the crime-fraud exception to the attorney-client privilege, "a breach of a fiduciary duty is equivalent to fraud").
[15] Although the trial court declared that constructive fraud sufficed for purposes of establishing the crime-fraud exception, the trial court actually found "misconduct," not mere negligence.

Constructive fraud is the term typically applied where a duty under a confidential or fiduciary relationship has been abused, or where an unconscionable advantage has been taken. Constructive fraud may be based on misrepresentation or concealment, or the fraud may consist of taking an improper advantage of the fiduciary relationship at the expense of the confiding party. See Fulton v. Clewiston, Ltd., 100 Fla. 257, 129 So. 773 (1930); Pryor v. Oak Ridge Dec. Corp., 97 Fla. 1085, 119 So. 326 (1928).
First Union Nat'l Bank v. Whitener, 715 So.2d 979, 982 (Fla. 5th DCA 1998). The Whitener court implied that the crime-fraud exception does not apply just because a trustee breaches some fiduciary duty.